UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ISABELLA HANKEY,<br>Plaintiff )<br>)<br>)<br>v. )<br>)<br>TOWN OF CONCORD-CARLISLE, )<br>CONCORD-CARLISLE SCHOOL DISTRICT, DIANA )<br>RIGBY, in her official and individual capacities, )<br>PETER BADALAMENT, in his official and individual )<br>capacities, and ALAN WEINSTEIN, in his official )<br>and individual capacities, )<br>Defendants )<br>) | Civil Action No.: |

## COMPLAINT AND JURY DEMAND

### INTRODUCTION

The Plaintiff, Isabella Hankey, brings this action seeking redress for violations of 20 U.S.C. § 1681, et seq. (Title IX), 42 U.S.C. § 1983, Massachusetts Civil Rights Act, Massachusetts Declaration of Rights, as well as violations of the common law.

The Massachusetts Anti-Bullying Law, M.G.L. c. 71, s. 37O, went into effect on May 3, 2010. The Massachusetts anti-bullying law does not create a separate cause of action. However, school districts may be liable for bullying under civil rights laws. The legal analysis is whether the bullying is sufficiently serious and pervasive to cause a hostile environment, whether the school has actual or constructive notice of the bullying, and whether the school failed to respond appropriately. Courts have looked to whether the school district demonstrated "deliberate indifference" or "bad faith or gross misjudgment." *Davis v. Monroe Cnty Bd. of Educ.*, 526 U.S. 629,633 (1999); *M.P. v. Indep. Sch. Dist.* No. 721, 326 F.3d 975, 982 (8th Cir. 2003).

In the instant case, as detailed herein, not only did the defendants respond to the pervasive bullying of Plaintiff with "deliberate indifference" and "bad faith or gross misjudgment", but the affirmative actions of the defendants including, but not limited to, the destroying of investigatory records, created, condoned and manifested the ongoing harassment of Plaintiff.

### JURISDICTION

Plaintiff, asserts federal jurisdiction under 28 U.S.C. § 1331, and pendent jurisdiction of her state law claims under 28 U.S.C. § 1367.

## PARTIES

1. Plaintiff, Isabella Hankey, is a resident of Carlisle, Massachusetts, which is part of Middlesex County.

2. Defendant Towns of Concord and Carlisle, are municipalities duly incorporated under the laws of the Commonwealth of Massachusetts

3. Defendant Concord-Carlisle School District, (the "District") is a duly constituted school district of the Commonwealth of Massachusetts and is a governmental entity that provides public education to students and is a recipient of federal funds.

4. Defendant Diana Rigby ("Superintendent Rigby") is named as a defendant both in her individual and official capacities. At all relevant times, she acted under color of state law as the Superintendent of Schools in the District.

5. Defendant Peter Badalament ("Principal Badalament") is named as a defendant both in his individual and official capacities. At all relevant times, he acted under color of state law as the Principal of the School.

6. Defendant Alan Weinstein ("Weinstein") is named as a defendant in his individual capacity. At all relevant times, he acted under color of state law as an employee of the School.

## FACTUAL BACKGROUND

7. Plaintiff, Isabella ("Belle") Hankey, is eighteen years old.

8. Plaintiff has been a student within the Carlisle School District since the age of five (5) and a student within the defendant Concord-Carlisle School District (Hereinafter "District") since the age of fourteen (14).

9. From September 2009 until June 2013, Plaintiff was a student at Concord-Carlisle High School ("CCHS").

10. As discussed herein, over a period of approximately two (2) years, Plaintiff was subjected to a pattern of bullying and harassment that went unabated by the District and/or its employees.

11. As a direct result of the failure of the District and the School District Employees to take prompt and effective steps reasonably calculated to end the harassment, eliminate any hostile environment and its effects, and prevent the harassment from recurring Plaintiff suffered and continues to suffer from severe stress and anxiety which has manifested itself in significant physical injuries.

12. On or about October 6, 2011, Plaintiff's vehicle was vandalized while parked in the Concord-Carlisle High School student parking lot. The vehicle was "keyed" with three long lines from the windshield on the driver's side down to the front of the hood.

13. Plaintiff immediately reported the vandalism to Concord-Carlisle High School officials, including defendant Alan Weinstein, who was responsible for the investigation and discipline of students within the school.

14. Plaintiff also reported the vandalism to Officer Scott Camilleri, a member of the Concord Police Department, and school "Resource Officer." (Attached hereto as Exhibit 1)

15. Each CCHS student pays a fee of three-hundred dollars ($300.00) for the privilege of parking in the student parking lot.

16. Concord Public Schools/Concord-Carlisle Regional School District has implemented a "Bullying Prevention and Intervention Plan." (Attached hereto as Exhibit 2)

17. Concord Public Schools/Concord-Carlisle Regional School District "Bullying Prevention and Intervention Plan" requires full and thorough investigation of all complaints of bullying.

18. Said "Bullying Prevention and Intervention Plan" states that "Before fully investigating the allegations of bullying or retaliation, the principal or designee will take steps to assess the need to restore a sense of safety to the alleged target and/or to protect the alleged target from possible further incidents."

19. Upon information and belief, the District and individual defendants took no action to investigate the vandalism or prevent such an act from recurring.

20. The "Bullying Prevention and Intervention Plan" also states that "Upon determining that bullying or retaliation has occurred, the principal or designee will promptly notify the parents or guardians of the target and the aggressor of this, and of the procedures for responding to it.

21. Upon information and belief neither, the District, defendant Principal Badalament nor any designee ever met with, let alone informed Plaintiff's parents about any of the following incidents or the procedures for responding to them.

22. In 2012, a Massachusetts statewide teacher survey was conducted, "Teaching, Empowering, Leading and Learning", where teachers from across the Commonwealth, including Concord Carlisle High School, were asked a series of questions regarding management of student conduct in their school. When asked whether they agree or disagree with the following statement; "school administrators consistently enforce rules for student conduct", only 13.6% of Concord Carlisle High School teachers agreed. (Attached hereto as Exhibit 3)

23. On or about February 9, 2012, Plaintiff's vehicle was vandalized a second time while parked in the Concord-Carlisle High School student parking lot. (Attached hereto as Exhibit 4)

24. A large amount of feces was smeared throughout areas of the exterior of Plaintiff's vehicle. Plaintiff was obviously extremely upset by this and became physically ill.

25. Again, defendant Alan Weinstein was made aware of the vandalism, however, neither the District nor the defendants took action to investigate the vandalism or prevent such a malicious act from recurring.

26. Upon information and belief neither, the District, defendant Principal Badalament nor any designee notified Plaintiff's parents about the incident or the procedures for responding to it.

27. On February 10, 2012, Michael Lonergan, a math teacher at CCHS, wrote an email to Caryn Haskins, Plaintiff's Guidance Counselor, stating that he didn't think that Belle was safe. Haskins forwarded the email to defendant Weinstein. (Attached hereto as Exhibit 5)

28. In said email, Mr. Lonergan stated that Belle and her friend had visited his classroom to "vent and talk about the past few days." Lonergarn stated "The short of their story is that they have been victimized through vandalization twice to vehicles in the student parking lot and once to a family home. They state that they have gone to administration and to Officer Camilerri. In all of their attempts they have been met with 'what did you do to deserve this?' and 'give us names.' Never once did they say that the school promised to support them and help make this environment safe for them. They clearly do not think that this building will support their issues right now."

29. Mr. Lonergan concluded by stating "The stories that I heard from Belle and (friend) do not sound like harmless teenage behavior, it sound like it has gone way beyond fun and games."

30. On or about February 16, 2012, six days after the email was sent by Mr. Lonergan, defendant Weinstein responded to Caryn Haskins stating "Will catch you up when I can. Suffice it to say, I'm totally on top of it."

31. On or about, March 8, 2012, Plaintiff's vehicle was vandalized while parked in the Concord-Carlisle High School student parking lot. The word "CUNT" was carved onto the rear bumper with a sharp object.

32. Again, Plaintiff reported the vandalism to Concord-Carlisle High School, including defendant Alan Weinstein.

33. When Plaintiff informed defendant Weinstein about the most recent vandalism, he responded by stating "I don't know what you want me to do."

34. Again, Plaintiff also reported the vandalism to Officer Camilleri. (Attached hereto as Exhibit 6)

35. Upon information and belief, the District took no action to investigate the vandalism or prevent such an act from recurring, nor did they initiate any meeting with plaintiff's family.

36. As a result of the inaction by the District, that same day Plaintiff's mother, Debra Hankey (Hereinafter "Mrs. Hankey"), went to CCHS to address the ongoing bullying and harassment.

37. Mrs. Hankey met with defendant Weinstein, Concord-Carlisle High School assistant principal, who was ostensibly in charge of the "investigation" of plaintiff's harassment and bullying.

38. Mrs. Hankey explained that she felt her daughter was being bullied and harassed. She requested that cameras be installed in the student parking lot.

39. Defendant Weinstein stated that "cameras are too expensive."

40. Defendant Weinstein repeatedly stated that "there is nothing I (Weinstein) can do" and offered no suggestions regarding who might be responsible.

41. Mrs. Hankey stated that the school administration's indifference to the ongoing bullying was unacceptable. She demanded that the District investigate and respond immediately and appropriately in a prompt, thorough and impartial manner.

42. However, the defendants failed to take prompt and effective steps reasonably calculated to end the harassment, eliminate any hostile environment and its effects, and prevent the harassment from recurring.

43. As a result of the inaction by the defendants, and Weinstein in particular, Mrs. Hankey and Plaintiff subsequently went to the Concord Police Department to report the harassment and vandalism.

44. The following day, Weinstein informed Plaintiff that he had "brought in his tools (blowtorch)" with him to school and would "cover up" the vandalism on Plaintiff's vehicle for her.

45. Plaintiff summarily denied defendant Weinstein's offer and told him not to touch her car or tamper with any potential evidence.

46. Mrs. Hankey and Plaintiff met with Patrolman Chip Moore. Officer Moore took a photo of plaintiff's vehicle, including the vandalized area where the word "Cunt" had been keyed into the rear bumper.

47. Officer Moore stated that "there is nothing the police can do." And referred plaintiff's parents back to the school, suggesting that it was a school matter.

48. Mrs. Hankey subsequently called defendant Diana Rigby, Superintendent of Concord School District and informed her of the recent bullying and harassment of Plaintiff.

49. Defendant Rigby informed Mrs. Hankey that she would look into the possibility of installing cameras in the student parking lot.

50. Mrs. Hankey criticized the way in which defendant Weinstein was conducting his "investigation."

51. Defendant Rigby stated to Mrs. Hankey that if there were any future issues, Plaintiff should contact Peter Badalament, Concord-Carlisle High School Principal, and not Alan Weinstein. No reason was given why they should not contact Alan Weinstein.

52. On March 10, 2012, despite her ongoing severe anxiety and stress, Plaintiff attended her SAT exam at another school.

53. On March 13, 2012, Plaintiff was very distressed and could not attend some of her classes.

54. On the same day at approximately 12:20 p.m., Mrs. Hankey left a message for defendant Rigby inquiring if any progress had been made regarding the investigation or installation of cameras.

55. Immediately thereafter, Mrs. Hankey called defendant Bedalament and left a message explaining how upset Belle was due to her ongoing fear of harassment and bullying.

56. Subsequently, defendant Badalament called Mrs. Hankey and stated that he would like to have Plaintiff see him before school in his office tomorrow.

57. Defendant Badalament also stated that Plaintiff should not "deal with Alan Weinstein" and that he "personally" will handle and investigate the situation. Badalament also said he was speaking with Concord PD and they may put an undercover police van with a camera in the parking lot.

58. In subsequent conversations between Plaintiff and Mrs. Hankey, Concord PD stated that they were never contacted by defendant Badalament about placing an undercover police van with a camera in the parking lot.

59. Mrs. Hankey informed defendant Badalament that Plaintiff had learned from a fellow student that "Student J" was telling other students that Plaintiff "deserved to have her car vandalized." Mrs. Hankey asked Badalament to speak to this student as a part of his "investigation."

60. On March 14, 2012, Mrs. Hankey sent an email and called defendant Diana Rigby requesting an update. Rigby never responded to the email and never returned the call.

61. On March 16, 2012, Mrs. Hankey called defendant Badalament due to the fact that she had not heard back from Badalament regarding their March 13 conversation.

62. Mrs. Hankey again inquired into the installment of cameras in the student parking lot. Badalament informed her that no progress had been made.

63. Despite the repeated requests for assistance in protecting their daughter, the defendants were indifferent and ignored the behavior of the students who were bullying and harassing Plaintiff. By their failure to take effective action, the defendants minimized and ignored the sexual harassment and bullying and failed to meet their legal obligation to take prompt and effective steps reasonably calculated to end the harassment.

64. On March 21, 2012, Mrs. Hankey called defendant Badalament. Once again, she received no response.

65. On the same day, despite the assurances by both defendants Rigby and Badalament, Plaintiff was informed that Alan Weinstein was still in charge of investigating the ongoing harassment and bullying, not defendant Badalament.

66. On March 27, 2012, Plaintiff's father, Mark Hankey ("Mr. Hankey") called and left a message for defendant Badalament at approximately 9:00 a.m. Badalament returned the call at 4:30 p.m. and left a message that he would call again tomorrow between 8 a.m. and 9 a.m.

67. On March 28, 2012, defendant Bedalament did not call. Mr. Hankey called Badalament and left a message. Badalament did not call back. Mr. Hankey then emailed requesting the opportunity to discuss the ongoing harassment and bullying of Plaintiff.

68. On March 29, 2012, Mr. Hankey called again for Badalament and left a message.

69. Later that day, Badalament finally returned Mr. Hankey's call.

70. Defendant Badalament reported that nothing has been done to take any steps to end the harassment. He stated that no cameras are being installed and that the police have not put an undercover car in the student lot as was requested.

71. Incredibly Badalament stated that an unnamed student was "keeping his ear to the ground" for information on plaintiff's situation.

72. On April 5 2012, Mr. and Mrs. Hankey retained a private investigator to assist them to determine who was harassing and bullying Plaintiff.

73. On May 12, 2012, Plaintiff attended the CCHS Prom. She traveled on a bus with some of

the students who were rumored to have vandalized her vehicle.

74. On May 13, 2012, Plaintiff traveled to work at Kimball's Ice Cream Shop in Carlisle where she worked as a cashier. Upon leaving work, Plaintiff noticed that her vehicle was once again vandalized. The symbol and word "#pathetic" was keyed across the passenger door.

75. Upon her arrival home, Plaintiff was extremely upset and sobbing uncontrollably.

76. Mr. Hankey and Plaintiff drove to the Carlisle Police Department and met with Sgt Whelan and Officer Debra Saponaro. (Attached hereto as Exhibit 7)

77. Plaintiff was asked if she had any ideas who may have vandalized her vehicle. Plaintiff stated that "Student MC" had previously 'tweeted' the symbol and word "#pathetic" about Plaintiff in approximately January of 2012.

78. Plaintiff stated that "Student MC" was shopping at Kimball's approximately two weeks prior to the incident. When "Student MC" noticed that she was in Plaintiff's checkout line, she said "Oh it's you" and proceeded to move into another line.

79. Officer Saponaro stated that Plaintiff should contact the school tomorrow and make them aware of the new incident.

80. Plaintiff did as she was instructed and on May 14, 2012, Mrs. Hankey called and left a message for defendant Badalament. She was told he would be in a meeting all day.

81. Subsequently, Mrs. Hankey also called defendant Rigby and informed her about the most recent incident. Rigby stated that she had "no updates" and that cameras still were not installed in the student parking lot.

82. Plaintiff's parents subsequently ordered two cameras to place in Plaintiff's vehicle.

83. On or about May 16, 2012, Sgt Whelan questioned "Student MC" regarding the recent vandalism of Plaintiff's vehicle. Sgt Whelan informed "Student MC" that she should not speak to Plaintiff about the questioning and should not try to intimidate or harass her.

84. On May 17, 2012, Plaintiff's vehicle was once again vandalized in the student parking lot between 7:20 and 8:00. The word "Retard" was carved onto the rear hatchback door.

85. Plaintiff subsequently attempted to report and discuss the most recent incident of vandalism with defendant Weinstein. Upon approaching defendant Weinstein's office, he stated to Plaintiff "I am too busy to deal with this. I am dealing with MCAS scores."

86. At no point did defendant Weinstein attempt to contact or schedule a meeting with Plaintiff after he told her that he was "too busy to deal with this (harassment of plaintiff)."

87. Plaintiff reported the incident to the school and to the Carlisle Police Department. (Attached hereto as Exhibit 8)

88. Plaintiff and Mrs. Hankey met with Det. Andrew Booth at the Carlisle PD who took photographs of vandalized areas. Despite all of the foregoing, the defendants took no action to investigate these incidents or to protect the plaintiff.

89. On May 22, 2012, John Sullivan, private investigator, spoke with the Concord PD and insisted that they encourage school officials to install surveillance cameras.

90. The following day, from May 23 through 25, 2012, Officer Scott Camilleri interviewed numerous students regarding the vandalism, harassment and bullying of Plaintiff.

91. On May 30, 2012, Plaintiff's car was vandalized once again. Plaintiff noticed the word "HAHA" carved into the driver's side front panel.

92. Plaintiff reported the incident to the Concord PD and met with a new officer, Damon Reinhold. Officer Reinhold stated that he would inform the school of the most recent incident. (Attached hereto as Exhibit 9)

93. On June 1, 2012, Mrs. Hankey and Officer Damon Reinhold reviewed a tape from the Depot building where Plaintiff first noticed the word "HAHA" on her vehicle. Upon review, Officer Reinhold stated that the damage most likely occurred in the student parking lot in the morning before she left for lunch and did not notice it until after she went out for lunch.

94. On June 1, 2012, Plaintiff was at softball practice located at CCHS. Plaintiff went to the female locker room to use the bathroom with a fellow student.

95. Upon entering the locker room Plaintiff saw the words "Kill Belle" carved into the wall of the bathroom stall. (Attached hereto as Exhibit 10)

96. Plaintiff immediately notified her softball coach, Lisa McGloin, who called Mrs. Hankey to inform her that she needed to come to the high school immediately.

97. Plaintiff and both of her parents met with Officer Camilleri and defendant Peter Badalament. (Attached hereto as Exhibit 11)

98. Defendant Badalament stated to Mrs. Hankey "The percentages of something happening to your daughter are really slim."

99. Prior to photographing the death threat carved into the bathroom stall, defendant Badalament attempted to have a maintenance person remove the words "Kill Belle."

100.    Plaintiff left defendant Badalament's office without any plan in place for

Plaintiff's safe return to school on Monday.

101.     The District, and specifically Defendant Badalament's, deliberate indifference to comply with and abide by established bullying and harassment prevention policies deprived Plaintiff of her clearly established, constitutionally protected liberty interest in bodily integrity, specifically, the right to be free from the abuse and injuries described herein.

102.     The defendant's indifference to and/or the intentional decision to protect the students bullying Plaintiff by attempting to remove and destroy crucial evidence prior to being analyzed by the police department is a clear example of the District and it's employees failure to meet their legal obligation to take prompt and effective steps reasonably calculated to end the harassment, eliminate any hostile environment and its effects, and prevent the harassment from recurring.

103.     Mrs. Hankey subsequently contacted Chad Koski and Louis Salemy, members of the Concord-Carlisle School Committee to explain the recent events and the ongoing pattern of harassment and bullying that Plaintiff was experiencing. Mrs. Hankey asked for their help in getting the administration to help Plaintiff and formulate a plan to prevent further bullying.

104.     Salemy promptly called defendant Diana Rigby to inquire about her knowledge of the recent death threat made against Plaintiff.

105.     After speaking to Rigby, Salemy called Mrs. Hankey back and stated that Defendant Rigby had no idea that a threat had ever occurred.

106.     Salemy stated that defendant Rigby would call Mrs. Hankey back.

107.     On June 2, 2012, Plaintiff was unable to attend her SAT test due to the severe stress and anxiety caused by the ongoing bullying and recent death threat.

108.     On June 3, 2012, no one from the administration had bothered to contact Plaintiff or her family. As a result Mr. Hankey called defendant Badalament and left a message demanding that someone return his calls.

109.     Defendant Rigby called shortly after and complained that the Concord PD was not "helping them" with Plaintiff's situation.

110.     Rigby stated that someone from the school staff would be "discreetly" shadowing Belle tomorrow.

111.     On June 4, 2012, Mr. Hankey contacted Lieutenant Roy Mulcahy, who stated that he was unaware of Plaintiff's current situation or the death threat made, and that no one from the school had ever contacted him regarding the threat.

112.      Lt. Mulchay planned a meeting at Concord PD with Plaintiff and her family.

113.      Upon information and belief, Mulchay also attempted to get administrators from the school to attend the meeting, but they declined.

114.      On June 4, 2012, the school assigned Ken Kopelman to "shadow" Plaintiff. Kopelman is an elderly man and is not affiliated with any local police department.

115.      Immediately following his assignment, Kopelman walked into Plaintiff's video production classroom and asked her teacher to point out Plaintiff in front of all of her classmates. Plaintiff was humiliated and felt ostracized as a result.

116.      Mrs. Hankey called defendant Badalament to inform him of the recent embarrassing exchange that occurred. Badalament stated that he found Plaintiff's story "hard to believe" and took no corrective action to ensure that a similar event would not occur in the future.

117.      Due to the inaction of the school and their failure and/or refusal to install cameras in the student parking lot, Mr. and Mrs. Hankey borrowed a friend's car, and installed two cameras facing Plaintiff's car while she was parked in the student parking lot and while at work.

118.      On June 7, 2012, a second death threat to Plaintiff was discovered. While heading to lunch, Plaintiff and three friends stopped in the bathroom. Plaintiff's friend noticed that written in red marker on the bathroom stall wall the words "Belle's dead at 9:15." (Attached hereto as Exhibit 12)

119.      Plaintiff and her parents immediately arranged to meet with defendant Badalament. (Attached hereto as Exhibit 13)

120.      Mr. Hankey pleaded for Badalament to hold a school wide assembly to ask students for help finding out who was making the death threats. Badalament refused, stating that it was not a good idea to disrupt the student's routine because of upcoming finals.

121.      After months of bullying and harassment, and two death threats, defendant Badalament drafted a letter that was sent out to all parents and students. Badalament set up an anonymous email site that anyone could send information to.

122.      On June 8, 2012, a third partial message was found in another girl's bathroom by another student stating "Don't Bell." The incident was reported to the Concord PD. (Attached hereto as Exhibit 14)

123.      On June 8, a concerned parent emailed defendant Badalament and informed him that she believed that the vandalism was done by "a group of sophomores who call themselves the 'sexy seven'." The email stated that "they have egged houses, keyed cars

and basically want to torment Belle." The email went on to state that "Student LR" was a member of the 'sexy seven' and was involved in the bullying. (Attached hereto as Exhibit 15)

124.    On June 12, 2012, Mrs. Hankey emailed Badalament and stated "Debra and I are very frustrated with the pace and what seems to be a lack of intensity in the schools investigation into the acts of violence towards our daughter Isabella." (Attached as exhibit 16)

125.    Mrs. Hankey informed Badalament about recent information she had learned from Officer Camilleri, who stated that he had been informed that "Student LR" was telling people she had vandalized Plaintiff's vehicle. Badalament stated he would meet with "Student FD" to confirm this information about "Student LR."

126.    Mr. Hankey concluded by stating "It seems to us that the kids are the ones controlling the school's investigation and that is very disappointing and frustrating."

127.    On June 14, 2012, a CCHS teacher Cricket McCaffrey, emailed defendant Badalament, Officer Camilleri, and Plaintiff's parents notifying them that a student had approached her and stated that it was Student LR who was responsible for vandalizing Plaintiff's car. (Attached hereto as Exhibit 17)

128.    Upon information and belief, Badalament did not question "Student LR" or either student who had provided this information.

129.    In June, 2012, Defendant Alan Weinstein abruptly resigned from CCHS.

130.    From June 15 through June 18, 2012, Plaintiff completed her final exams.

131.    On July 18, 2012, Mr. and Mrs. Hankey sent a letter to the School Committee, and defendants Diana Rigby and Peter Badalament. (Attached hereto as Exhibit 18)

132.    The letter stated the following; "I am writing to express my disappointment in how the Concord Carlisle High School administration handled the death threats to my daughter Isabella that were written in the High School's bathroom stalls this past spring. The administration's investigation into these incidents and the response to the vandalism to her car in the school's student parking lot was incompetent and lack the diligence needed to find the person or persons responsible."

133.    The letter stated "After additional incidents of bullying and vandalism to Isabella's car in March my wife Debra inquired about putting cameras in the student parking lot. Peter Badalament told my wife that it was too expensive and that it would cost $100,000 to install cameras."

134.    "It fell on my wife and I to set up surveillance on Isabella's car in the student parking lot daily and to take the lead in pushing to make sure that all leads in the

investigation were being followed up and that everyone involved knew what each other did that day. But in the end the school year ended with no resolution."

135.      "Throughout the time of these incidents Isabella missed a lot of classes due to either being too upset to attend or meeting with police and administrators about the most recent incident. Belle's teachers and guidance counselor were never informed about what was happening until two weeks before school was out. Some mentioned to us their disappointment of being unaware of the situation and felt if they had known they could have been more supportive during the school year."

136.      The letter concluded by requesting a meeting with the school committee, the high school administration and the Concord and Carlisle Police to discuss a plan of action.

137.      Throughout the summer Plaintiff experienced severe anxiety over the thought of returning to school.

138.      On July 30, 2012, Mr. and Mrs. Hankey initiated a meeting with members of the administration. It was decided that cameras were finally to be installed in the student parking lot.

139.      Badalament "guaranteed" that cameras would be installed in the school parking lot prior to the beginning of the school year.

140.      At said meeting, Defendant Badalament stated to Mr. and Mrs. Hankey "I don't want to throw anyone under the bus, but if Alan Weinstein didn't do his job I guess I have to take responsibility for that too."

141.      In response to Mr. Hankey's July 18 letter, Badalament denied ever stating that the cameras were too expensive and would cost $100,000.00.

142.      Ultimately, when cameras were finally operational, the cost for installation was $125,805.00. (Attached hereto as Exhibit 22)

143.      On August 18, 2012, Plaintiff's car was vandalized; the word "READY?" was carved into the driver side rear panel by the gas cap. The car was also keyed across the passenger side door. (Attached hereto as Exhibit 19)

144.      Plaintiff reported the incident to the Concord Police Department who stated they would notify the school. (Attached hereto as exhibit 20)

145.      August 20, 2012, Mrs. Hankey called the high school and left a message for defendant Badalament. Mrs. Hankey also emailed Badalament and asked him to call her immediately.

146.      August 21, 2012, Badalament did not respond to either the email or phone message. Mrs. Hankey called Brian Miller, the new Assistant principal and updated him

regarding the latest incident and requested that he notify defendant Badalament.

147.    On August 23, 2012, Badalament called Mrs. Hankey and scheduled a meeting for Tuesday August 28.

148.    On August 28, 2012, Plaintiff went to the high school for her meeting with Badalament. Upon arrival at the High School lobby, Plaintiff began to have a severe anxiety attack and was physically unable to walk through the building.

149.    CCHS Nurse, Chris DeBruzzi, saw Plaintiff during her anxiety attack and stated that "No one should be this afraid to go to school."

150.    After approximately twenty-five minutes Plaintiff was able to go into the high school and meet with defendant Badalament, Brian Miller, Caryn Haskins and Michael Goodwin. (Attached hereto as Exhibit 21)

151.    It was determined that cameras would be installed in the student parking lot and in the hallways outside of student bathrooms. Plaintiff was informed by Peter Badalament that the installation will not be complete until the week of September 11 and not before the beginning of the school year as he had previously guaranteed. A letter to this effect was also sent to all CCHS staff bringing awareness to the situation.

152.    As a result of the ongoing harassment and fear for her own safety, Plaintiff enrolled in a specialty program, Rivers and Revolutions program ("R&R"), where she was required to take classes in a separate modular building away from the main student body.

153.    On August 30, 2012, Plaintiff's car was professionally installed with cameras by her parents due to the fact cameras were not going to be operational when school began.

154.    On September 4, 2012, Plaintiff reluctantly returned for her first day of school at CCHS.

155.    On September 10, 2012, Plaintiff was experiencing severe anxiety due to the previous death threat which stated "Belle will be dead by 9:15." During the police investigation it was mentioned to Plaintiff that "9:15" could also reflect a date, September 15.

156.    On September 14, 2012, Plaintiff saw "September 15" written on the bathroom stall wall. In another stall nearby, Plaintiffs' name, "Belle", was written. Plaintiff immediately notified the school and her mother. (Attached hereto as Exhibit 23)

157.    Mrs. Hankey was informed by Officer Camilleri that it was not necessary to come to the high school because the writing had already been washed from the walls. (Attached hereto as Exhibit 24)

158.    Mrs. Hankey met with Assistant Principal Brian Miller, who informed her that no bathrooms security checks had been performed.

159.    On or about September 14, 2012, a CCHS teacher, Cricket McCaffrey, emailed defendant Badalament and stated the following; "I was surprised to learn that there was another threat against Belle Hankey that was found in a bathroom Friday....surprised because nothing has been communicated out to the faculty. I know you understand and respect that in dealing with the safety and well being of all students, teacher should have timely information on threats and chronic or severe instances of bullying. Having the eyes and ears of the faculty is surely an added layer of security." ( Attached here to as Exhibit 25)

160.    Although the defendant had agreed to have the cameras installed and operating by September 11, they were not operating until September 25. During that interim, additional threats and harassment occurred to plaintiff.

161.    Defendant Badalament responded to Mr. McCaffrey's email by stating "The short version is that what was written wasn't actually a threat although it was disconcerting to Belle. I agree that you should have been notified seeing as that you and Lisa have been such key support figures for her." (Attached hereto as Exhibit 26)

162.    As described more fully throughout this Complaint, Superintendent Rigby, Peter Badalament and Alan Weinstein acted with deliberate indifference in response to their actual knowledge of the previous and ongoing deprivations to Plaintiff's well-established constitutional and federal statutory rights.

163.    On September 17, 2012, defendant Badalament emailed Mr. Hankey and stated that there was "no excuse on the delay" installing cameras and "apologize(g) that the job wasn't finished before school started." (Attached hereto as Exhibit 27)

164.    On September 18, 2012, Mr. Hankey sent an email to defendant Rigby. In said email; "What concerns us is that it does not seem the Safety Plan we spoke about for Belle's return to school has been put into action. After the latest incident of writing on the bathroom wall last Friday some things became very evident. The cameras that were to be place by the bathrooms in the school as well as the ones in the parking lot are still not operations." (Attached hereto as Exhibit 28)

165.    "It was also disturbing to find out from Ms. Meaney [newly hired assistant principal] that she had not been fully informed of the history of the threats against Belle last year and did not realize the connection and significance of the date written on the bathroom wall last Friday. Also disturbing was to find out that all of the adults in the school have not been notified of the ongoing situation with Belle."

166.    On September 19, 2012, Plaintiff returned to the Rivers and Revolutions program classroom. A new threat was discovered on the wall of the "S building" bathroom. It was carved onto the wall of one of the stalls. It was a circle with a line drawn thru it and

Belle's name was in the middle (Attached hereto as Exhibit 29)

167.     Later that day defendant Badalament notified CCHS teachers that "This week there was an incident of graffiti relating to Belle. It was not a threat, however it remains disconcerting." (emphasis added) (Attached hereto as Exhibit 30)

168.     On or about September 20, 2012, Mrs. Hankey informed defendant Badalment that Plaintiff was working with an advocate, Ellen Chambers, to assist them with the ongoing bullying.

169.     On September 25, 2012, Mrs. Hankey received an email response from Defendant Badalament listing dates that he can meet to discuss a plan for Plaintiff's next semester. He also stated that the cameras are fully operational.

170.     On September 25, 2012, Mrs. Hankey sent defendant Badalament a request pursuant to Massachusetts Student Records Regulations 603 CMR 23.07(2)(d) stating "I request that a third party of my choice, Ellen Chambers, be allowed to inspect the records of my child." (Attached hereto as Exhibit 31)

171.     The request stated "Please contact Ms. Chambers immediately upon receipt of this request as regulations state that access cannot be delayed for more than ten (10) days unless I consent to a delay [603 CMS 23.07(2).]"

172.     On October 2 2012, Mrs. Hankey spoke with Officer Camilleri who said that he took another student's statement on Friday who had seen a text message from "Student LR" saying how she was responsible for keying Plaintiff's car on March 8th.

173.     Despite multiple requests by Mr. Hankey, and after informing him of the recent information, defendant Badalament refused to question "Student LR" regarding the vandalism.

174.     October 5, 2012, advocate Ellen Chambers called the school to follow up on the records request that was sent on September 25, stating that by law the school had ten (10) days to provide Plaintiff's records.

175.     Defendant Badalament contacted Ms. Chambers and stated that he was "embarrassed" that no one in the office was in receipt of such a letter.

176.     On October 11, 2012, Mrs. Hankey met Ms. Chambers at CCHS to review all copies of the Plaintiff's records.

177.     Despite the written request for all of Plaintiff's records, Vice-principal Alan Weinstein's records were never provided. Mrs. Hankey requested that Badalament provide defendant Weinstein's records as well as the missing nurse's records. Badalament said he wasn't sure if he was allowed to release Weinstein's investigative records but would check.

178.     On October 15, 2012, Mrs. Hankey delivered a second letter requesting both Alan Weinstein's records and the nurse's records. (Attached hereto as Exhibit 32)

179.     Badalament subsequently texted Mrs. Hankey saying the nurse's records were ready to be picked up, but he was "still working on Alan Weinstein's records."

180.     On the same day, Plaintiff was admitted to Emerson Hospital with a blood clot.

181.     On October 16, 2012, Plaintiff underwent a series of blood tests. Plaintiff was diagnosed with a severe clot that started at her groin and ended near her heart. The clot was over 6 inches long and was determined to be directly related to the stress caused by the defendant's deliberate indifference to the ongoing bullying and hostile environment that was created and condoned.

182.     On October 17, 2012, Plaintiff underwent surgery to remove the blood clot.

183.     On October 19, 2012, Plaintiff was rushed to Emerson Hospital in the evening with chest pains and shortness of breath. Plaintiff underwent a CAT scan in the emergency room which revealed that she had a pulmonary embolism.

184.     On October 21, 2012, Plaintiff was transported from Emerson Hospital to Massachusetts General Hospital ("MGH").

185.     On October 22, 2012, the plaintiff's family received an email from defendant Badalament via Ms. Chambers stating that defendant Alan Weinstein "had shredded" all the records of the "investigation" he conducted regarding the bullying and harassment of the plaintiff. (Attached hereto as Exhibit 33)

186.     In said email Badalament stated that "He (Weinstein) shared with me in an email that he shredded all of his files when he retired last June. He though based on records law this is what he was supposed to do – in this case, he was wrong."

187.     Concord Public Schools/Concord-Carlisle Regional School District has previously implemented a "Bullying Prevention and Intervention Plan." (Attached hereto as Exhibit 3)

188.     In said plan it states that "Each School will document any incident of bullying that is reported per this police and a file will be maintained by the Principal or designee."

189.     The anti-bullying plan continues by stating "To the extent practicable, and given his/her obligation to investigate and address the matter, the principal or designee will maintain confidentiality during the investigative process. The principal or designee will maintain a written record of the investigation." (emphasis added)

190.     Upon information and belief the defendant Weinstein deliberately shredded and

otherwise destroyed crucial evidence that would have demonstrated who had perpetrated the harassment of plaintiff as well as demonstrating the defendants' indifference to the plight of plaintiff.

## COUNT I
20 U.S.C. § 1681, et seq. (Title IX)
### Hostile Environment – Sexual Harassment and Discrimination
### Plaintiff v. Concord-Carlisle School District

191.    Plaintiffs hereby incorporate each and every allegation in the preceding paragraphs of this Complaint as if set forth in full herein.

192.    At all relevant times, the specific acts of bullying and harassment, including, inter alia, the student's vandalism and use of the word "Cunt" were based on Plaintiff's sex.

193.    As described more fully throughout this Complaint, and at all relevant times, this sex-based bullying and harassment created a hostile environment for Plaintiff because it was sufficiently severe, pervasive, or persistent so as to interfere with or limit Plaintiff's ability to participate in or benefit from the services, activities, or opportunities offered by the District.

194.    As described more fully throughout this Complaint, at all relevant times the School District Defendants knew or should have known about the hostile environment that existed for Plaintiff at the School.

195.    As described more fully throughout this Complaint, at all relevant times the School District Defendants failed to investigate and respond immediately and appropriately in a prompt, thorough and impartial manner and failed to take prompt and effective steps reasonably calculated to end the harassment, eliminate any hostile environment and its effects, and prevent the harassment from recurring.

196.    As described more fully throughout this Complaint, the School District Defendants instead affirmatively encouraged, supported and/or condoned the unlawful harassment by, inter alia:
   a. Intentionally choosing to protect the students who were bullying Plaintiff at her expense by minimizing and ignoring the sexual harassment and other bullying and otherwise failing to meet their legal obligation to take prompt and effective steps reasonably calculated to end the harassment, eliminate any hostile environment and its effects, and prevent the harassment from recurring;
   b. Intentionally choosing to allow the bullying and harassment to continue unabated without adequately training the School's staff how to identify and address bullying and harassment in the School;
   c. Intentionally choosing not to notify all employees of the ongoing harassment including, but not limited to, death threats.
   d. Intentionally choosing to impose only the most minimal and ineffective remedial

measures to address the bullying and harassment, rather than to escalate the punishments and other remedies as required by the District's own policy and by law when the lesser measures had clearly failed;

e.  Intentionally delaying and frustrating the remediation by illegally destroying documentation related to the harassment and bullying.

197.    As a direct result of the failure of the District and the School District Defendants to take prompt and effective steps reasonably calculated to end the harassment, eliminate any hostile environment and its effects, and prevent the harassment from recurring Plaintiff suffered and continues to suffer from severe stress and anxiety resulting in significant physical injuries.

198.    As a direct result of the failure of the District and the School District Defendants to take prompt and effective steps reasonably calculated to end the harassment, eliminate any hostile environment and its effects, and prevent the harassment from recurring, Plaintiff's parents suffered and continue to suffer severe emotional distress accompanied by physical manifestations thereof, including, inter alia, depression, anxiety, sleep disturbances, social isolation, financial losses and other ongoing mental, physical and emotional harm.

199.    As described more fully throughout this Complaint, at all relevant times, Defendants' conduct was outrageous and due to evil motive or reckless indifference for Plaintiff's rights and so outrageous as to demonstrate willful, wanton or reckless conduct.

## COUNT II
### 42 U.S.C. § 1983
U.S. Constitution – Fourteenth Amendment – Substantive Due Process
Plaintiff v. Concord Carlisle School District, Defendant Diana Rigby in her official and individual capacities, Defendant Peter Badalament in his official and individual capacities, and Alan Weinstein in his individual capacity.

200.    Plaintiffs hereby incorporate each and every allegation in the preceding paragraphs of this Complaint as if set forth in full herein.

201.    As described more fully throughout this Complaint, policy makers for the District, including the Concord Carlisle School District Board of Directors, Superintendent Diana Rigby and Principal Badalament, established and maintained policies, customs and practices that affirmatively contributed to Plaintiff being deprived of her clearly established, constitutionally protected liberty interest in bodily integrity, specifically, the right to be free from the abuse and injuries described herein.

202.    Among the policies, customs and practices that affirmatively contributed to these deprivations were:

a. The policy makers' intentional decisions to protect the students bullying Plaintiff at the Plaintiff's expense by minimizing and ignoring the sexual harassment and other bullying

and failing to meet their legal obligation to take prompt and effective steps reasonably calculated to end the harassment, eliminate any hostile environment and its effects, and prevent the harassment from recurring;

b. The policy makers' intentional decisions to refuse to take appropriate disciplinary action against the students and District employees;

c. The policy makers' intentional decisions to allow the bullying and harassment to continue unabated without adequately training the School's staff how to identify and address bullying and harassment in the School;

d. The policy makers' intentional decisions to impose only the most minimal and ineffective remedial measures to address the bullying and harassment, rather than to escalate the punishments and other remedies as required by the District's own policy and by law when the lesser measures had clearly failed;

f. Intentionally delaying and frustrating the remediation by illegally destroying documentation related to the harassment and bullying.

203.    As described more fully throughout this Complaint, policy makers for the, District, including the Concord Carlisle School District Board of Directors, Superintendent Diana Rigby and Principal Badalament had actual knowledge of the prior and ongoing deprivations to Plaintiff's well established constitutional and federal statutory rights.

204.    As described more fully throughout this Complaint, policy makers for the District, including the Concord Carlisle School District Board of Directors, Superintendent Diana Rigby and Principal Badalament acted with deliberate indifference in response to their actual knowledge of the prior and ongoing deprivations to Plaintiff.'s well-established constitutional and federal statutory rights.

205.    As described more fully throughout this Complaint, the actions of policy makers for the District, including the Concord Carlisle School District Board of Directors, Superintendent Diana Rigby and Principal Badalament violated federal law, including Title IX, by, inter alia: Failing to adopt and implement an effective anti-harassment and anti-bullying policy in the School;.

206.    As described more fully throughout this Complaint, policy makers for the District, including the Concord Carlisle School District Board of Directors, Superintendent Diana Rigby, Principal Badalament and Alan Weinstein failed to train District personnel adequately in the areas of sexual harassment and bullying response and prevention, despite an obvious and known need for such training.

207.    As described more fully throughout this Complaint, there is a plausible nexus between this failure to provide adequate training and Plaintiff's constitutional and statutory deprivations described herein.

208.    As described more fully throughout this Complaint, the District's failure to adequately train its employees to handle recurring situations such as the escalating victimization of Plaintiff and to communicate pertinent information regarding bullying and subsequent death threats created the obvious potential for violation of Plaintiff's right to bodily integrity, and in fact did lead to such violations.

209.    As described more fully throughout this Complaint, each defendant named in this Count individually participated in or approved of the violations of Plaintiff's well-established federal statutory and constitutional rights.

210.    As described more fully throughout this Complaint, Defendants with supervisory capacity within the District, including the Concord Carlisle School District Board of Directors, Superintendent Diana Rigby, Principal Badalament and Alan Weinstein had knowledge of and affirmatively encouraged, supported and/or condoned violations of Plaintiff's well-established constitutional and federal statutory rights by their subordinates.

## COUNT III
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
Plaintiff v. Defendant Diana Rigby in her official and individual capacities, Defendant Peter Badalament in his official and individual capacities, and Alan Weinstein in official and individual capacities

211.    Plaintiffs hereby incorporate each and every allegation in the preceding paragraphs of this Complaint as if set forth in full herein.

212.    As described more fully throughout this Complaint, Defendants intentionally and outrageously subjected Plaintiff to severe emotional distress manifesting in significant physical injuries by purposefully evading their legal obligation to take prompt and effective steps reasonably calculated to end the harassment, eliminate any hostile environment and its effects, and prevent the harassment from recurring.

213.    As described more fully throughout this Complaint, at all relevant times Defendants' conduct was extreme and outrageous, going beyond all bounds of decency.

214.    As described more fully throughout this Complaint, at all relevant times Defendants' conduct was motivated by callous indifference to Plaintiffs' rights.

215.    As a direct result of Defendants' outrageous behavior, Plaintiff suffered and continue to suffer severe emotional distress accompanied by physical manifestations thereof, including, inter alia, depression, anxiety, sleep disturbances, social isolation, financial losses and other ongoing mental, physical and emotional harm.

## COUNT IV
### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
Plaintiff v. Defendant Diana Rigby in her official and individual capacities, Defendant Peter Badalament in his official and individual capacities, and Alan Weinstein in official and individual capacities

216.     Plaintiffs hereby incorporate each and every allegation in the preceding paragraphs of this Complaint as if set forth in full herein.

217.     A reasonable and prudent person in the same or similar circumstances as Defendants would know or should have known that Plaintiff's emotional distress was a foreseeable result of this extreme and outrageous conduct.

218.     As described more fully throughout this Complaint, at all relevant times Defendants' conduct was extreme and outrageous, going beyond all bounds of decency.

219.     As described more fully throughout this Complaint, at all relevant times Defendants' conduct was motivated by callous indifference to Plaintiffs' rights.

220.     As a direct result of Defendants' outrageous behavior, Plaintiff suffered and continues to suffer severe emotional distress accompanied by physical manifestations thereof, including, inter alia, depression, anxiety, sleep disturbances, social isolation, financial losses and other ongoing mental, physical and emotional harm.

## COUNT V
### The Massachusetts Civil Rights Act (M.G.L. ch. 12, §§ 11H, I)

221.     Plaintiffs hereby incorporate each and every allegation in the preceding paragraphs of this Complaint as if set forth in full herein.

222.     The MCRA may be applied to protect a bullying victim when a perpetrator's threatening or intimidating behavior interferes with his or her education.

223.     Defendants, in their official and individual capacities, and under color of law, attempted to interfere with, and interfered with plaintiff's exercise and enjoyment of rights secured by the constitution and laws of the United States, and the constitution and laws of the Commonwealth, by threats, intimidation and coercion, including their right to free speech and equal protection of the laws.

## COUNT VI
### Violation of Article X of the Massachusetts Declaration of Rights.

224.     Plaintiffs hereby incorporate each and every allegation in the preceding paragraphs of this Complaint as if set forth in full herein.

225.    Article X of the Massachusetts Declaration of Rights provides that no citizen of Massachusetts may be deprived of the enjoyment of his or her property without due process of law.

226.    Defendants' violation of Plaintiff's substantive due process and right to safety and protection was so extreme as to shock the conscience and thus violated Article 10 of the Massachusetts Declaration of Rights.

THE PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL COUNTS SO TRIABLE.
WHEREFORE, the Plaintiff, Isabella Hankey, respectfully requests that this Court:

1. Enter judgment in her favor on each Count of this Complaint;

2. Award her compensatory damages including, but not limited to, emotional distress damages;

3. Award the Plaintiff her costs and attorneys' fees;

4. Award the Plaintiff multiple and/or punitive damages; and

5. Award the Plaintiff such other relief as this Court deems just, equitable and appropriate.

Respectfully submitted,
For the Plaintiff
By Her Attorney,

LAW OFFICES OF TIMOTHY M. BURKE

Timothy M. Burke
BBO #065720
160 Gould Street, Suite 100
Needham, MA  02194
(781) 455-0707

<u>Certificate of Service</u>

I hereby certify that I have served a true copy of the foregoing documents upon each other attorney of record through the Electronic Filing System (ECF).

Dated:        8/5/13