UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ISABELLA HANKEY, | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | *  Civil Action No. 13-cv-11870-IT |
| | * |
| TOWN OF CONCORD-CARLISLE, | * |
| CONCORD-CARLISLE SCHOOL | * |
| DISTRICT, DIANA RIGBY, in her | * |
| official and individual capacities, PETER | * |
| BADALAMENT, in his official and | * |
| individual capacities, ALAN WEINSTEIN, | * |
| in his official and individual capacities, | * |
| | * |
| Defendants. | * |

MEMORANDUM

September 30, 2015

TALWANI, D.J.

I.    Introduction

Plaintiff Isabella Hankey ("Plaintiff") brings this suit alleging that Defendants failed to

adequately respond to a pattern of bullying and threats she suffered at the hands of other students

at Concord-Carlisle High School.  Plaintiff asserts claims under Title IX of the Education

Amendments of 1972, 42 U.S.C. § 1983, and certain Massachusetts provisions against the Town

of Concord-Carlisle (the "Town"), the Concord-Carlisle School District (the "School District"),

Superintendent Diana Rigby ("Superintendent Rigby"), Principal Peter Badalament ("Principal

Badalament"), and Assistant Principal Alan Weinstein ("Assistant Principal Weinstein").

Presently before the court is Defendants' Motion for Summary Judgment [#34].

Upon reviewing the summary judgment record, the court concludes that Plaintiff has

presented evidence that she was subject to serious and escalating incidents of bullying and

threats during her time at Concord-Carlisle High School.  From the summary judgment evidence, a jury could find that Defendants' response to these incidents was at times ineffective and unreasonable, and that Defendants should have done more to protect Plaintiff and take the incidents seriously.  However, the strict and demanding legal requirements for the causes of action that Plaintiff has brought preclude liability in this case.  For this reason and as described more fully below, there is no genuine dispute as to any material fact and Defendants are entitled to judgment as a matter of law.

II.     Factual Background[1]

A.  *The School District's Bullying Prevention and Intervention Plan*

When Plaintiff began her freshman year in September 2009, Concord-Carlisle High School had adopted a "Bullying Prevention and Intervention Plan."  The Plan required that the school "fully investigat[e] . . . allegations of bullying or retaliation," and before doing so, "the principal or designee will take steps to assess the need to restore a sense of safety to the alleged target and/or to protect the alleged target from possible further incidents."  Pl.'s Statement of Undisputed Material Facts ¶ 119 [#55] [hereinafter Pl.'s Facts].  The Plan further required the school to "document any incident of bullying that is reported," "maintain a written record of the investigation," and "have a means for anonymous reporting."  Pl.'s Facts ¶¶ 158, 210-11.  As described below, this Plan was not followed in this case.

B.  *The Bullying and Threats*

In September 2009, at the start of Plaintiff's freshman year, three girls posted a picture

---

[1] Unless otherwise indicated, the following facts are taken from the parties' Local Rule 56.1 statements and responses, and are undisputed or not properly disputed for purposes of summary judgment.  See Fed. R. Civ. P. 56(c), (e)(2).  In ruling on summary judgment, the court properly construes the facts, as supported by the record, in the light most favorable to Plaintiff, the nonmovant.  See Prescott v. Higgins, 538 F.3d 32, 39 (1st Cir. 2008).

online giving Plaintiff the middle finger.  Defs.' Statement Undisputed Material Facts ¶ 2 [#35] [hereinafter Defs.' Facts].

At the beginning of Plaintiff's sophomore year, a student left Plaintiff a voicemail message after a weekend party telling Plaintiff: "Don't you ever fucking come near anyone I know."  Debra Hankey Dep. 47-49 in Pl.'s Ex. D [#40-3].

In the fall of Plaintiff's junior year, on October 6, 2011, lines were keyed on Plaintiff's car while the car was parked in the school parking lot.  Defs.' Facts ¶ 6.  Other students had also experienced incidents of vandalism to their cars in the school parking lot around this time. Defs.' Facts ¶ 8.

The majority of harassing incidents occurred during the spring of Plaintiff's junior year. On February 10, 2012, when Plaintiff returned to her car parked at the school parking lot, she found feces on the driver's side door of her car.  Defs.' Facts ¶ 14.  A month later, on March 8, 2012, Plaintiff and a friend went to the school parking lot and discovered the word "cunt" keyed on the rear bumper of Plaintiff's car.  Defs.' Facts ¶ 19.  On May 13, 2012, while Plaintiff's car was parked at Kimball Farm's Ice Cream, where Plaintiff worked, someone keyed "#pathetic" onto her car.  Defs.' Facts ¶ 35.  A friend of hers had also seen "#pathetic" posted online about Plaintiff.  Defs.' Facts ¶ 37.  On the morning of May 17, 2012, while in the school's parking lot, Plaintiff discovered the word "retard" keyed onto her car.  Defs.' Facts ¶ 38; Pl.'s Facts ¶ 141. On May 30, 2012, Plaintiff's noticed "ha-ha" keyed on the driver's side door of her car while the car was parked at a restaurant.  Defs.' Facts ¶¶ 43-44.

On Friday, June 1, 2012, Plaintiff returned to the school locker room during softball practice and discovered the words "Kill Belle" in a bathroom stall.  Defs.' Facts ¶ 48.  On June 7, 2012, Plaintiff was in the school bathroom with friends when she discovered the words "Belle's

dead at 9:15" in a bathroom stall. Defs.' Facts ¶ 68. On June 8, 2012, a student discovered "Don't Belle" written on a bathroom stall at school. Defs.' Facts ¶ 80.

On August 19, 2012, during the summer before her senior year, Plaintiff discovered the word "Ready?" keyed by her gas tank and a key marking across her passenger door after having parked her car overnight at a friend's house. Defs.' Facts ¶ 90; Pl.'s Facts ¶ 170.

At the start of Plaintiff's senior year, on September 14, 2012, Plaintiff found "September 15" written on a bathroom stall at school. Defs.' Facts ¶ 98. Plaintiff looked in other stalls and saw her name elsewhere. Defs.' Facts ¶ 99. On September 19, 2012, a student discovered the name "Belle" with a slash through it in a school bathroom stall. Defs.' Facts ¶ 103.

### C. Defendants Had Notice of the Incidents of Bullying and Threats

When Plaintiff started at Concord-Carlisle High School, the Individual Defendants were employed by the School District. Alan Weinstein was Assistant Principal, Peter Badalament was Principal, and Diana Rigby was Superintendent. Detective Scott Camilleri, who is not a named defendant, was the School Resource Officer and an employee of the Police Department.

The record reflects that Assistant Principal Weinstein and Principal Badalament were promptly advised of nearly all of the incidents directed at Plaintiff during her freshman through senior years. Defs.' Facts ¶¶ 2, 6-7, 21, 25, 41, 49-51, 70, 72, 80, 99, 102; Pl.'s Facts ¶¶ 121, 126-127, 162; Ex. 5 to Compl. in Pl.'s Ex. B; Ex. 25 to Compl. in Pl.'s Ex. B; Debra Hankey Dep. 72 in Pl.'s Ex. D; Weinstein Dep. 171-72 in Defs.' Ex. C.[2]

---

[2] It is unclear from the parties' statements of facts whether the Individual Defendants had notice (1) that students had left an attacking voicemail message on Plaintiff's phone during her sophomore year, (2) that "ha-ha" was keyed on Plaintiff's car while parked near a restaurant on May 30, 2012, and (3) that "Ready?" was keyed on Plaintiff's car while parked overnight at a friend's house on August 19, 2012.

*D. The School District and Police Department's Efforts to Protect Plaintiff's Car From Vandalism*

The record documents efforts by the school and police to protect Plaintiff's car from vandalism. When lines were first keyed on Plaintiff's car on October 6, 2011, Assistant Principal Weinstein told Principal Badalament about the incident. Defs.' Facts ¶ 7. Both Assistant Principal Weinstein and Plaintiff spoke with Detective Camilleri about the incident. Defs.' Facts ¶ 9. Plaintiff told Detective Camilleri that she had no idea who may have keyed her car. Defs.' Facts ¶ 10. Detective Camilleri took pictures of the car and told Plaintiff that he would investigate further. Defs.' Facts ¶¶ 10-11. Assistant Principal Weinstein told Plaintiff that she could park her car in an alternative parking lot, which had previously assisted a student whose car had been vandalized. Defs.' Facts ¶ 13.

After feces was smeared on Plaintiff's car door and the word "cunt" was keyed onto Plaintiff's car in February and March of 2012, Principal Badalament again offered Plaintiff an alternative parking lot. Defs.' Facts ¶ 26. Detective Camilleri met with Plaintiff and took photographs of her car. Defs.' Facts ¶¶ 22-23. Principal Badalament emailed Assistant Principal Weinstein, Detective Camilleri, and Assistant Principal Truslow stating that he would look into getting cameras placed in the parking lot and that "I want all 3 of you to help out investigating." Defs.' Facts ¶ 29; Defs.' Ex. D (email attached to affidavit). Detective Camilleri responded to the email and stated that he had requested more patrol units to go through the parking lot, that he would spend more time in the lot in both marked and unmarked units, and that he would look into getting cameras installed. Defs.' Facts ¶ 30; Defs.' Ex. D. Assistant Principal Weinstein testified that following these incidents, the school sent two monitors to the school parking lot for large amounts of the day. Weinstein Dep. 100 in Defs.' Ex. C. Based on Plaintiff's testimony, it is unclear whether the two monitors had been assigned to the parking lot prior to these incidents.

Pl.'s Dep. 24-25 in Defs.' Ex. A. Additionally, police officers, including Detective Camilleri, went to the school parking lot for certain amounts of the day. Defs.' Facts ¶ 28.

After Plaintiff found "Kill Belle" in a bathroom stall at school on June 1, 2012, the school assigned a monitor to watch Plaintiff's car during the day for the month of June. Defs.' Facts ¶ 54. Detective Camilleri also told Plaintiff's parents that he wanted Plaintiff to park in the alternative lot near the cafeteria because police had installed a camera there. Defs.' Facts ¶ 60; Camilleri Aff. ¶ 10.

During the summer of 2012, the school worked on obtaining bids and proposals to have permanent cameras installed at the school, including five exterior pole-mounted cameras in the parking lot. Defs.' Facts ¶ 87. By the week of September 11, 2012, the school's cameras had been installed. Defs.' Facts ¶ 97. The cameras became operational on or about September 19. Defs.' Facts ¶ 97.

### E. The School District's Limited Efforts to Protect Plaintiff from Bullying Prior to the First Death Threat

Although the record reflects the above efforts to protect Plaintiff's car from vandalism, the record shows meager efforts to root out the cause and stop the bullying of Plaintiff prior to actual threats being made.

Assistant Principal Weinstein testified that after he learned that students had posted a picture online giving Plaintiff the middle finger at the beginning of Plaintiff's freshman year in 2009, he spoke with the three girls accused of posting the picture, told the girls to take the picture down, spoke with the girls' mothers, spoke with Detective Camilleri about the incident, and later checked in on Plaintiff. Defs.' Facts ¶¶ 2, 5. Assistant Principal Weinstein produced no notes or records documenting these conversations.

After Plaintiff's car was first keyed on October 6, 2011, Assistant Principal Weinstein

informed Principal Badalament and spoke with Plaintiff and Detective Camilleri about the incident. Defs.' Facts ¶¶ 7, 9. Assistant Principal Weinstein testified that he also spoke with two of the girls accused of posting the online picture of Plaintiff in 2009 to see if they knew anything about the keying. Defs.' Facts ¶ 12. Although Weinstein testified that he "wrote up the incident," Defendants have not produced any reports or notes of these alleged student interviews. Pl.'s Facts ¶ 118; Weinstein Dep. 68 in Pl.'s Ex. C.

Assistant Principal Weinstein testified that after he learned that feces had been smeared on Plaintiff's car in February 2012, he again spoke with the students about the incident. Weinstein Dep. 81-82, 116 in Pl.'s Ex. C. Defendants have not, however, produced any notes of these alleged conversations. Also after the feces incident, Plaintiff's math teacher e-mailed Plaintiff's guidance counselor expressing concern, and Plaintiff's guidance counselor forwarded the email to Assistant Principal Weinstein. Pl.'s Facts ¶¶ 125, 126; Ex. 5 to Compl. in Pl.'s Ex. B. In response, Assistant Principal Weinstein did not enlist the guidance counselor or math teacher's assistance in ferreting out the bullying, but instead responded "Will catch you up when I can. Suffice it to say, I'm am [sic] totally on top of it." Pl.'s Facts ¶ 127; Ex. 5 to Compl. in Pl.'s Ex. B.

After "cunt" was keyed on Plaintiff's car in March 2012, Assistant Principal Weinstein met with Plaintiff's mother in the school office. Pl.'s Facts ¶ 130; Weinstein Dep. 102-03 in Pl.'s Ex. C. Detective Camilleri met with Plaintiff in the school office as well. Defs.' Facts ¶ 22. Assistant Principal Weinstein's recollection of the conversation in which Plaintiff reported this incident offers no acknowledgement of the bullying that was transpiring and focuses instead on her demeanor in reporting the incidents. In describing this conversation, Weinstein testified:

> I had related to her what I was doing and who I was trying to speak to, and I
> basically told her that I have told the police, I have told the principal, we are

working on it.  She kept screaming at me. . . . And at some point I said, ". . . I don't know what else you would like me to do."

Pl.'s Facts ¶ 128; Weinstein Dep. 145 in Pl.'s Ex. C.  Consistent with this testimony, Assistant Principal Weinstein wrote in an email to Principal Badalament about the investigation that "[m]y main interaction was the one in which . . . [Plaintiff] attacked me verbally."  Pl.'s Ex. H.

The same day that Plaintiff found "cunt" keyed on her car, Plaintiff's mother called Superintendent Rigby to express dissatisfaction with the school's handling of the incidents. Defs.' Facts ¶ 24.  Superintendent Rigby told Plaintiff's mother that Principal Badalament would be their primary contact going forward.  Defs.' Facts ¶ 24.[3]  Following Mrs. Hankey's conversation with Superintendent Rigby, Principal Badalament spoke with Mrs. Hankey and met with Plaintiff.  Defs.' Facts ¶ 25.  Although Assistant Principal Weinstein testified that he spoke with a number of students following the keying of "cunt" on Plaintiff's car, Defs.' Facts ¶ 31, Defendants have not produced any notes from these interviews.

On May 13, 2012, after Plaintiff found "#pathetic" keyed on her car while parked at Kimball Farm's Ice Cream, Mrs. Hankey left a message for Principal Badalament.  Debra Hankey Dep. 72 in Pl.'s Ex. D.  Principal Badalament did not return her call until after Plaintiff's car was keyed again four days later.  Debra Hankey Dep. 83 in Defs.' Ex. E.

On May 17, 2012, when Plaintiff discovered the word "retard" keyed onto her car and

---

[3] Principal Badalament subsequently testified that "it was my impression that not enough had been done and that's why I took over" and there "could have been more discrete or concrete things put in place to ensure Belle's safety."  Pl.'s Facts ¶ 133; Badalament Dep. 60-61 in Pl.'s Ex. E.  In what appears to be a timeline prepared for litigation, Principal Badalament states in regard to Weinstein's investigation: "Generally speaking from what I later learned it was not handled well.  I accept full responsibility for his actions or lack thereof."  Pl.'s Facts ¶ 135; Pl.'s Ex H (TOCC001039).  Superintendent Rigby testified that she did not know whether Weinstein had been filling out forms reporting the incidents and was "concerned."  Pl.'s Facts ¶ 134; Rigby Dep. 107 in Pl.'s Ex. G.

tried to speak with Assistant Principal Weinstein, he told her that he could not "deal with it right now" because "tomorrow is MCAS" exams and "Mr. Badalament is the person you are supposed to talk to." Weinstein Dep. 171-72 in Defs.' Ex. C. Plaintiff reported the incident to Principal Badalament. Defs.' Facts ¶ 41. That day, Principal Badalament called Mrs. Hankey regarding the "#pathetic" marking from four days prior. Debra Hankey Dep. 83 in Defs.' Ex. E. Inspector Booth and Detective Camilleri met with Plaintiff and her mother and took photographs of the keyed marking. Defs.' Facts ¶ 40.

There is no evidence in the record that throughout all of the keying and vandalism, prior to the first threat, Assistant Principal Weinstein or Principal Badalament reached out in any way to faculty, coaches, or parents (other than the Hankeys) for their assistance in investigating the bullying.

     *F.*     *The School District's Greater Efforts to Protect Plaintiff After the Death Threats*

On Friday, June 1, 2012, after Plaintiff found "Kill Belle" written on a bathroom stall at school, Plaintiff's parents met with Principal Badalament and Detective Camilleri. Defs.' Facts ¶ 51. Detective Camilleri advised Inspector Booth of the Carlisle Police Department of the incident and requested extra patrol of the Hankey residence. Defs.' Facts ¶ 52. Two days later, on Sunday, June 3, 2012, Superintendent Rigby called the Hankeys and told them that a monitor would be shadowing Plaintiff on Monday at school. Debra Hankey Dep. 110 in Defs.' Ex. E.

The next day, on Monday, June 4, 2012, Ken Kopelman ("Kopelman"), a campus monitor "in his 60's or 70's," was assigned to shadow Plaintiff during the school day. Defs.' Facts ¶ 53; Pl.'s Facts ¶ 154; Badalament Dep. 146 in Pl.'s Ex. E. At 7:00 a.m. that Monday, Detective Camilleri met with Superintendent Rigby and Principal Badalament. Defs.' Facts ¶ 55. Principal Badalament provided Detective Camilleri and Kopelman copies of Plaintiff's schedule. Defs.' Facts ¶ 55. Detective Camilleri advised Kopelman to call him on his cell phone when

Plaintiff left school. Defs.' Facts ¶ 56. Principal Badalament may also have sent out a

"Connect-Ed" message to the school community advising that a threat had been found and that

school officials were working with police. Camilleri Report, Compl. Ex. 11 in Defs.' Ex. B.[4]

At 11:30 a.m. that Monday, June 4, 2012, Principal Badalament held an Incident

Management Team meeting in the school's office, which Lieutenant Crowe from the Carlisle

Police Department attended. Defs.' Facts ¶ 58. The members of the team were briefed on the

incident. Defs.' Facts ¶ 58. That afternoon, Plaintiff's parents had a meeting with a number of

police officers and Detective Camilleri at the Concord Police Station, to which school

administrators were invited but did not attend. Defs.' Facts ¶ 59; Pl.'s Facts ¶ 153; Debra

Hankey Dep. 106 in Pl.'s Ex. D.

Ken Kopelman shadowed Plaintiff during her classes that Monday, June 4, 2012, and

watched her get into her car and leave for home. Defs.' Facts ¶ 61. Principal Badalament

testified that he heard that Kopelman had gone into Plaintiff's video class and asked the teacher

to identify Plaintiff in front of other students, and that this had not been executed properly. Pl.'s

Facts ¶ 154; Badalament Dep. 147 in Pl.'s Ex. E. According to Plaintiff, Kopelman embarrassed

her and could not protect her. Defs.' Facts ¶ 63. The next day, the Hankeys asked that

Kopelman stop shadowing Plaintiff. Defs.' Facts ¶ 63. The school assigned a female tutor to

monitor Plaintiff and then a third person. Defs.' Facts ¶ 64. Plaintiff and her parents were not

satisfied with either of these monitors. Defs.' Facts ¶ 64. Plaintiff's softball coach, Coach

---

[4] Detective Camilleri's police report reflects that this message was sent. Camilleri Report,
Compl. Ex. 11 in Defs.' Ex. B. Plaintiff disputes this fact by pointing to Coach McGloin's
testimony that: "[W]hen the incident happened in June the year before, one of our biggest issues
was that until the day I was in school, no formal announcement had been made to any of the
teachers or coaches or maintenance." McGloin Dep. 73 in Pl.'s Ex. I. It is unclear what Coach
McGloin means, however, by "until the day I was in school."

McGloin, then began to shadow Plaintiff, as did teacher McCaffrey.  Defs.' Facts ¶ 65.  This arrangement continued for the remaining two weeks of the school year.  Defs.' Facts ¶ 65.

On June 7, 2012, after Plaintiff found "Belle's dead at 9:15" on a school bathroom stall, Assistant Principal Weinstein and Coach McGloin called Detective Camilleri.  Defs.' Facts ¶ 71.  When Detective Camilleri arrived, he photographed the markings and then met with Principal Badalament, teacher McCaffrey, Plaintiff, Mrs. Hankey, and Plaintiff's friend.  Defs.' Facts ¶ 72.  After Plaintiff and her friend recounted what happened, teacher McCaffrey escorted Plaintiff back to class at Plaintiff's request.  Defs.' Facts ¶ 72.  A detective arrived to photograph the marking while another detective attempted to process the stall for fingerprints but the results were negative.  Defs.' Facts ¶ 73.  Mrs. Hankey asked Principal Badalament to hold a school assembly to ask students to come forward with information, but Principal Badalament did not think that an assembly was a good idea.  Defs.' Facts ¶ 74.

That day, on June 7, 2012, Principal Badalament held another Incident Management Team meeting.  Defs.' Facts ¶ 75.  Detective Camilleri asked the school to collect handwriting samples from junior and senior girls.  Badalament Dep. 168 in Pl.'s Ex. E.  The school gathered handwriting samples from English classes; however, Principal Badalament's understanding "was that there had been only one person in the state who could effectively [analyze handwriting samples] in a court admissible way and that that person . . . was retired."  Id. at 169.  Principal Badalament testified that "we just looked at [the samples] to the best of our ability" because "there was nobody to send the stuff to."  Id.

Also on June 7, 2012, Principal Badalament sent out a "Connect-Ed" message to the school community advising them of the threat and that the school was working with police.  Defs.' Facts ¶ 76.  The message contained an email address for the anonymous reporting of tips,

and tips came in. Defs.' Facts ¶ 76. Prior to June 2012, the school did not have an anonymous means for reporting. Defs.' Facts ¶ 158; Badalament Dep. 136 in Pl.'s Ex. E.

The next day, June 8, 2012, the school held another Incident Management Team meeting, during which members discussed a letter that teachers were going to read during first block classes urging students to report any information. Defs.' Facts ¶ 75-77. Plaintiff testified that the reading subsequently took place. Plaintiff Dep. 78 in Defs.' Ex. A. Tips came in and Detective Camilleri spoke with students who were the subjects of tips. Defs.' Facts ¶¶ 78-79.

On June 8, 2012, after a student reported discovering "Don't Belle" written on a bathroom stall, Principal Badalament called Detective Camilleri. Defs.' Facts ¶ 80. Detective Camilleri photographed the marking, noticed the handwriting appeared different from previous markings, and attempted to process the stall for fingerprints but the results were negative. Defs.' Facts ¶ 81. That same day, Principal Badalament received an email from a parent informing him that there was talk that a particular group of students known as the "Sexy Seven" were behind the incident, and named a particular student "LR." Defs.' Facts ¶ 82; Pl.'s Facts ¶ 160. Three days later, on June 11, 2012, Detective Camilleri spoke with Principal Badalament about having cameras installed. Defs.' Facts ¶ 83.

On June 14, 2012, teacher McCaffrey emailed Principal Badalament, Detective Camilleri, and Plaintiff's parents notifying them that a student had given her the name of a particular student "LR" that was allegedly involved in vandalizing Plaintiff's car. Pl.'s Facts ¶ 162; Ex. 17 to Compl. in Pl.'s Ex. B. Principal Badalament testified that he spoke with student "LR." Pl.'s Facts ¶ 163; Badalament Dep. 177-78 in Pl.'s Ex. E. When asked if he interviewed "LR" a second time, Principal Badalament testified: "No. I think I had gotten everything I could out of her . . . it didn't seem to make sense to interview her again. She was denying, denying, denying .

12

. . ." Pl.'s Facts ¶ 194; Badalament Dep. 178 in Pl.'s Ex. E.

Around June 16, 2012, after the school's electrician installed the necessary power sources, the Concord Police installed cameras outside four or five girls' bathrooms, including those in the A, H, S, and L Buildings.  Defs.' Facts ¶ 84; Camilleri Aff. ¶ 11 in Defs.' Ex. D. According to Plaintiff, however, Defendants did not turn over any footage from before September 19, 2012.  It is therefore unclear whether the cameras were operational or used by the school or police.

On June 18, 2012, Detective Camilleri and another detective met with a particular student and the student's mother, informing the student that her name continually came up in connection with the Hankey investigation.  Defs.' Facts ¶ 85.  The student denied involvement or knowledge of any incidents involving Plaintiff.  Defs.' Facts ¶ 85.

Assistant Principal Weinstein testified that, around this time, he spoke with a group of students known as the "Sexy Seven" regarding the threat; however, Defendants have not produced any notes or reports of these alleged student interviews.  Defs.' Facts ¶ 66.

Assistant Principal Weinstein retired at the end of the school year in June 2012.  Defs.' Facts ¶ 86.  Based on the record, it is disputed whether Assistant Principal Weinstein discarded any notes regarding the Hankey investigation when he retired.  Weinstein testified that he "gave those few notes that I had on the case to Peter [Badalament]" and "I took almost everything that was in my desk and dumped in into the recycling bin [b]ut nothing having to do with Belle Hankey was destroyed."  Weinstein Dep. 210-20 in Pl.'s Ex. C.  However, in response to an email from Principal Badalament requesting Weinstein to produce his "files/notes from last spring (legal request)" regarding the Hankey investigation, Weinstein wrote:

> Unfortunately, I deemed it best to destroy my disciplinary records, except what I reported on X2, which included suspensions, etc.  Perhaps, if it would help,

maybe I could reconstruct some things with you and Scott [Camilleri]. My main interaction was the one in which . . . Belle attacked me verbally. Otherwise I was simply reportage [sic] of 2 keying incidents and 2 bathroom wall incidents, but I don't have dates or further info on them. So, I can meet with you and Scott [Camilleri], but I can't provide written documentation.

Pl.'s Ex. H. In response to receiving this email, Principal Badalament emailed the Hankeys:

[Weinstein] shared with me in an email that he shredded all of his files when he retired last June. . . . [T]his disturbed [me] a great deal when I learned of it. While we do not have copies of his notes, I am confident that all useful information has been documented in my files as I took over the investigation from him in early June.

Ex. 33 to Compl. in Pl.'s Ex. B.

During the summer of 2012, the school worked on obtaining bids and proposals to have permanent cameras installed at the school, including fourteen cameras in the school's interior. Defs.' Facts ¶ 87.

In late July 2012, the Hankeys met with Principal Badalament, Superintendent Rigby, Detective Camilleri, Officer Reinold, Brian Miller (a new Assistant Principal), the school's attorney, and the Hankeys' attorney. Defs.' Facts ¶ 88. The Hankeys presented a list of things they wanted done in preparation for the upcoming school year, including installation of cameras, better communication, and bathroom checks. Defs.' Facts ¶ 89.

On August 28, 2012, Plaintiff and her parents attended a meeting at the school with Principal Badalament, Michael Goodwin, and Guidance Counselor Haskins to discuss the plan for Plaintiff's return to school, which included notifying staff, restroom plans, and assigning a "go-to" person. Defs.' Facts ¶ 94. Upon arriving at school, Plaintiff had an anxiety attack and was unable to enter the building for twenty-five minutes. Pl.'s Facts ¶ 172. When Plaintiff was able to enter the building, the school nurse told the Hankeys that "nobody should ever be this afraid to go to school." Pl.'s Facts ¶ 172; Debra Hankey Dep. 128 in Pl.'s Ex. D. At the meeting, the attendees also discussed that the installation of cameras was not going to be

completed by the start of the school year but was expected to be completed by September 11 (exterior cameras) and September 14 (interior cameras). Defs.' Facts ¶ 96; Pl.'s Facts ¶ 173. Plaintiff had enrolled in the new Rivers and Revolutions Program for the following semester, where she would take classes in a separate modular building away from the remainder of the student body. Pl.'s Facts ¶ 174. Plaintiff was introduced to teacher Michael Goodwin, who was going to be Plaintiff's teacher as part of the Program. Defs.' Facts ¶ 95. One of Plaintiff's friends in the Program was going to accompany her to the restrooms. Defs.' Facts ¶ 95.

By the week of September 11, 2012, the school's cameras had been installed; however, the company installing the cameras had difficulty getting them operational. Defs.' Facts ¶ 97. The cameras became operational on or about September 19. Defs.' Facts ¶ 97.

On September 14, 2012, after Plaintiff found "September 15" and her name on a bathroom stall at school, Plaintiff and her mother met with Assistant Principal Miller, teacher Goodwin, and Detective Camilleri. Defs.' Facts ¶ 102.

Also around this time, teacher McCaffrey emailed Principal Badalament:

> I was surprised to learn that there was another threat against Belle Hankey that was found in a bathroom on Friday . . . surprised because nothing has been communicated out to the faculty. I know you understand and respect that in dealing with the safety and well being of all students, teachers should have timely information on threats and chronic or severe instances of bullying.

Pl.'s Facts ¶ 178; Ex. 25 to Compl. in Pl.'s Ex. B. Principal Badalament replied to teacher McCaffrey discounting the events: "The short version is that what was written wasn't actually a threat although it was disconcerting to Belle. I agree that you should have been notified seeing as that you and Lisa have been such key supporting figures for her. I did share what happened with the Chairs yesterday." Pl.'s Facts ¶ 179; Ex. 26 to Compl. in Pl.'s Ex. B. Principal Badalament subsequently testified regarding this email: "I guess that is what I said there. But

when I think about it, they are clearly threatening things that were written on the walls." Pl.'s Facts ¶ 180; Badalament Dep. 203 in Pl.'s Ex. E.

On September 17, 2012, Principal Badalament emailed Mr. Hankey:

On the camera front, it's my understanding that they finished the installation last week and that we are supposed to get trained to use them this week. No excuse on the delay other than I know it was a difficult process to get them in, however, I apologize that the job wasn't finished before school started.

Pl.'s Facts ¶ 181; Ex. 27 to Compl. in Pl.'s Ex. B. As stated above, the cameras became operational on or about September 19, 2012. Defs.' Facts ¶ 97.

On September 19, 2012, when a student reported discovering the name "Belle" with a slash through it in a bathroom stall, Assistant Principal Miller called Detective Camilleri and secured the bathroom. Defs.' Facts ¶ 103. Assistant Principal Miller called Mrs. Hankey, who asked that teacher Goodwin escort Plaintiff to her car at the end of the day. Defs.' Facts ¶ 104. Detective Camilleri met with Assistant Principal Miller and Assistant Principal Colleen Meany in the bathroom, where Detective Camilleri photographed the markings. Defs.' Facts ¶ 105.

After school that day, September 19, 2012, Detective Camilleri and Assistant Principal Miller met with the Hankeys. Defs.' Facts ¶ 106. At the meeting, Detective Camilleri advised that there was limited information to follow up on. Defs.' Facts ¶ 107. Mrs. Hankey identified persons she thought might be involved or might know information about a text message between some students. Defs.' Facts ¶ 107. From this point until October 2012, Detective Camilleri spoke with various students who had been identified as having knowledge or involvement, including the students allegedly involved in the student text message identified by Mrs. Hankey. Defs.' Facts ¶ 109. No further incidents of bullying or threats were reported after September 19, 2012. Defs.' Facts ¶ 110.

III.    Discussion

Defendants move for summary judgment on all counts.  The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  Garside v. Osco Drug, Inc., 895 F.2d 46, 50 (1st Cir. 1990) (quoting Fed. R. Civ. P. 56 advisory committee's note).  Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party.  A fact is material if it has the potential of determining the outcome of the litigation."  Patco Constr. Co. v. People's United Bank, 684 F.3d 197, 206-07 (1st Cir. 2012) (internal quotation marks and citations omitted).  In ruling on a motion for summary judgment, the court must view the record in the light most favorable to the nonmovant and draws all reasonable inferences in the nonmovant's favor.  Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990).

"To succeed, the moving party must show that there is an absence of evidence to support the nonmoving party's position."  Rogers v. Fair, 902 F.2d 140, 143 (1st Cir. 1990).  If the moving party does so, "the burden shifts to the nonmoving party to establish the existence of an issue of fact that could affect the outcome of the litigation and from which a reasonable jury could find for the [nonmovant]."  Id.  "It is settled that the nonmovant may not rest upon mere allegations, but must adduce specific, provable facts demonstrating that there is a triable issue."  Id. (quoting Brennan v. Hendrigan, 888 F.2d 189, 191 (1st Cir. 1989)).

A.    *Count I: Title IX*

In Count I, Plaintiff brings a claim against the Town and School District for sex discrimination under Title IX.  "Title IX prohibits gender-based discrimination in a wide array of

programs and activities undertaken by educational institutions." Frazier v. Fairhaven Sch. Comm., 276 F.3d 52, 65 (1st Cir. 2002). It provides that "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). In Davis v. Monroe Cnty. Bd. of Educ., the Supreme Court recognized that a school receiving federal funds may be liable for sex-based discrimination under Title IX if the school is deliberately indifferent to student-on-student sexual harassment that is sufficiently severe and pervasive to deprive the student of educational opportunities or benefits. 526 U.S. 629, 633, 650 (1999). To prevail on such a claim, a plaintiff must establish that: (1) the school had actual knowledge of the harassment, (2) the harasser was under the school's control, (3) the harassment was based upon the victim's sex, (4) the harassment was "so severe, pervasive, and objectively offensive that it effectively bar[red] the victim's access to an educational opportunity or benefit," and (5) the school was deliberately indifferent to the harassment. Id.

Defendants move for summary judgment on Plaintiff's Title IX claim on the ground that Plaintiff has not presented evidence from which a jury could find that she was subject to severe and pervasive harassment "based upon sex." See Frazier, 276 F.3d at 66. "Discrimination on the basis of sex is the sine qua non of a Title IX sexual harassment case." Id. In the context of a Title IX sexual-harassment claim, "the plaintiff 'must always prove that the conduct at issue was not merely tinged with offensive sexual connotations,' but in fact constituted discrimination 'because . . . of sex.'" Id. (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998)); see, e.g., id. at 67 (affirming dismissal of Title IX claim "[i]n the absence of conduct creating a sex-based hostile educational environment").

Plaintiff presents two arguments in opposition to summary judgment on this ground.

First, Plaintiff contends that a jury could find that she suffered severe and pervasive sexual harassment because on March 8, 2012, the word "cunt" was keyed into the rear bumper of her car. See Pl.'s Post Summ. J. Hearing Br. 6 [#77] ("The carving of the word "c**t into Plaintiff's bumper was severe . . . [and] by its very definition is sexual harassment.").

Plaintiff relies on Title VII case law in which courts have found that the repeated and pervasive use of sexually-degrading, gender-specific epithets and comments in the workplace may constitute actionable sexual harassment. See, e.g., Forrest v. Brinker Int'l Payroll Co., 511 F.3d 225, 229 (1st Cir. 2007) (holding that male co-worker's conduct in, *inter alia*, repeatedly calling plaintiff a "whore," "slut," "bitch," and "cunt" over the course of months could constitute sexual harassment); Marrero v. Goya of P.R., Inc., 304 F.3d 7, 19 (1st Cir. 2002) (affirming jury finding of sexually hostile work environment where female plaintiff was subject to "humiliating sexual remarks and innuendos" on a daily basis for over a year); Winsor v. Hinckley Dodge, Inc., 79 F.3d 996, 1000 (10th Cir. 1996) (holding that evidence that male employees consistently called plaintiff "whore," "floor whore," "curb whole," "curb side cunt," and "bitch," a male employee pushed plaintiff against a wall and placed his knee between her legs, and other men made comments to plaintiff that a woman had no place in a car dealership was sufficient to establish sexual harassment); Andrews v. City of Phila., 895 F.2d 1469, 1485 (3d Cir. 1990) ("[T]he pervasive use of derogatory and insulting terms relating to women generally and addressed to female employees personally may serve as evidence of a hostile environment.").

Even in the Title VII context, however, the First Circuit has found that "isolated incidents" may not constitute pervasive sexual harassment. See Kosereis v. Rhode Island, 331 F.3d 207, 216 (1st Cir. 2003) ("A hostile work environment generally is not created by a 'mere offensive utterance,' nor does it arise from . . . 'isolated incidents.'" (internal citations omitted));

see, e.g., Pomales v. Celulares Telefonica, Inc., 447 F.3d 79, 84 (1st Cir. 2006) (affirming summary judgment on Title VII claim on the ground that male supervisor's sexual comment and gesture on one occasion did not rise to the level of severe and pervasive sexual harassment); Ponte v. Steelcase, Inc., 741 F.3d 310, 320 (1st Cir. 2014).

Moreover, although Title VII case law is instructive for Title IX purposes, see Frazier, 276 F.3d at 65-66, the Supreme Court has cautioned courts to "bear in mind that schools are unlike the adult workplace and that children may regularly interact in a manner that would be unacceptable among adults." Davis, 526 U.S. at 651; see also id. at 651-52 ("[I]n the school setting, students often engage in insults, banter, teasing, shoving, pushing, and gender-specific conduct that is upsetting to the students subject to it. . . ."). Cf. id. at 633-34 (finding Title IX claim plausible where student, *inter alia*, repeatedly attempted to touch plaintiff's breasts and genitals, made vulgar statements such as "I want to get in bed with you" and "I want to feel your boobs," placed a doorstop in his pants and then acted in a sexual manner towards plaintiff, and rubbed his body against plaintiff).

Plaintiff has not provided evidence from which a jury could find that the harasser(s) act of keying "cunt" into Plaintiff's car bumper on one occasion constitutes severe and pervasive sexual harassment, as required for a Title IX claim. See Pomales, 447 F.3d at 83 ("[S]ummary judgment is an appropriate vehicle for polic[ing] the baseline for hostile environment claims." (internal quotation marks and citation omitted)). Nor has Plaintiff provided evidence from which a jury could find that this keying incident deprived Plaintiff of access to educational opportunities or benefits, or that the Defendants responded with deliberate indifference to this incident. Accordingly, to the extent Plaintiff argues that the harasser(s)'s act of keying "cunt" into her car, standing alone, gives rise to a Title IX claim, her argument fails.

Second, Plaintiff argues that a jury could reasonably find that the other incidents of bullying and threats were "based upon sex" as well, and that all incidents taken together constitute severe and pervasive sexual harassment. As described above, the other incidents include posting a picture online giving Plaintiff the finger; leaving a voicemail for Plaintiff stating "Don't you ever fucking come near anyone I know"; keying a line on Plaintiff's car; smearing feces on Plaintiff's car door; keying "#pathetic" on Plaintiff's car; posting "#pathetic" online about Plaintiff; keying "retard" on Plaintiff's car; keying "ha-ha" on Plaintiff's car door; marking "Kill Belle" on a bathroom stall; marking "Belle's dead at 9:15" on a bathroom stall; marking "Don't Belle" on a bathroom stall; keying "Ready?" on Plaintiff's car; marking "September 15" on a bathroom stall; and marking "Belle" with a slash through it on a bathroom stall. These fourteen other incidents have no implicit or explicit sexual or gender connotations, and do not provide any indication that they were related to sex or gender.

Plaintiff contends that because the harasser(s) used a gender-specific term on one occasion—*i.e.* keying "cunt" into Plaintiff's car—a jury could reasonably infer that the remaining fourteen incidents of threats and bullying were also "based upon sex." Plaintiff points to a number of cases for the proposition that "if it reasonably could be inferred that [seemingly gender neutral conduct] was [actually] related to gender . . . then it is for the trier of fact to decide whether such an inference should be drawn." O'Shea v. Yellow Tech. Servs., Inc., 185 F.3d 1093, 1097 (10th Cir. 1999); Chavez v. New Mexico, 397 F.3d 826, 833 (10th Cir. 2005) ("[W]hen a plaintiff introduces evidence of both gender-based and gender-neutral harassment, and when a jury, viewing the evidence in context, 'reasonably could view all of the alleged harassing conduct . . . as the product of sex and gender hostility,' then 'it is for the fact finder to decide whether such an inference should be drawn.'" (quoting O'Shea, 185 F.3d at 1102, 1097));

Landrau-Romero v. Banco Popular de P.R., 212 F.3d 607, 614 (1st Cir. 2000) ("Alleged conduct that is not explicitly racial in nature may, in appropriate circumstances, be considered along with more overtly discriminatory conduct in assessing a Title VII harassment claim.").

However, the cases Plaintiff relies on for this proposition involved *repeated* and *pervasive* sexual or gender-specific comments, epithets, and/or conduct that "so poisoned the entire body of conduct towards Plaintiff" that a jury could reasonably view other facially neutral conduct directed at the plaintiff as sexual or gender-based as well.  See O'Shea, 185 F.3d at 1102; see, e.g., EEOC v. PVNF, LLC, 487 F.3d 790, 798-99 (10th Cir. 2007) (holding that where supervisor, *inter alia*, "frequently" made degrading and "indisputably gender-related remarks," it was for the jury to determine whether repeated comments referring to plaintiff as a "bitch" "were made because of gender animus"); Chavez, 397 F.3d at 833-36 (finding that based on supervisor's gender-based conduct towards plaintiff—including sexually propositioning plaintiff, rubbing the front of his body against plaintiff's backside, staring at plaintiff lewdly while massaging his genitals, and calling plaintiff a "fucking bitch"—a "jury could infer that the [supervisor's] arguably gender-neutral harassment . . . was in fact based on gender"); Johnson v. Spencer Press of Me., Inc., 364 F.3d 368, 376 (1st Cir. 2004) ("Given the *consistency* of the harassment that specifically invoked Johnson's religion and the more frequent harassment that did not, a jury could easily have concluded that the underlying motivation—religious discrimination—was the same for each." (emphasis added)).

That is not the case here.  Plaintiff has identified the use of only one gender-specific term on one occasion over the course of over a year of gender-neutral bullying and threats.  On this record, and without more, a fair-minded jury could not reasonably infer that the bullying and threats were sexual in nature or based upon Plaintiff's gender.  See, e.g., Frazier, 276 F.3d at 67

(affirming dismissal where plaintiff had "not alleged facts from which it reasonably can be inferred that [the school discipline matron's conduct, including peering at plaintiff through a crack in a bathroom stall as plaintiff was relieving herself and continually leering, scowling, and pointing at plaintiff] was of a sexual nature or based on [plaintiff's] sex"); Morgan v. Town of Lexington, No. 14-13781-DJC, 2015 WL 5634463, at *8-9 (D. Mass. Sept. 24, 2015); Patenaude v. Salmon River Central Sch. Dist., No. 3:03-CV-1016, 2005 WL 6152380, at *6 (N.D.N.Y. Feb. 16, 2005) ("Without question, Plaintiff was treated in a despicable and unacceptable manner by other students. That said, however, there is insufficient evidence in the record before the Court suggesting that Plaintiff was harassed by others students because she was female.").

As stated above, it is Plaintiff's burden to establish "that the conduct at issue was not merely tinged with offensive sexual connotations, but in fact constituted discrimination because . . . of sex." Id. at 66 (internal quotation marks and citations omitted); see also id. ("Discrimination on the basis of sex is the sine qua non of a Title IX sexual harassment case."). Because no fair-minded jury could reasonably find that Plaintiff was discriminated against based upon sex, summary judgment is granted on Count I.[5]

### B.     Count II: Section 1983 Substantive Due Process

In Count II, Plaintiff asserts a claim against Defendants under 42 U.S.C. § 1983, alleging that Defendants violated Plaintiff's substantive due process right to bodily integrity.[6] Plaintiff

---

[5] The court need not address Defendants' three alternative grounds for summary judgment on Plaintiff's Title IX claim.

[6] In her post-hearing brief, Plaintiff describes the constitutional right at stake as the Fourteenth Amendment "right to education." However, "[p]ublic education is not a 'right' granted to individuals by the Constitution." Plyler v. Doe, 457 U.S. 202, 221 (1982); San Antonio Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1, 35 (1973) ("Education, of course, is not among the rights afforded explicit protection under our Federal Constitution. Nor do we find any basis for saying it is implicitly so protected."). In accordance with Plaintiff's Complaint, the court will construe the right at issue as the Fourteenth Amendment substantive due process right to bodily integrity.

does not allege that Defendants directly violated her right to bodily integrity, but rather that Defendants failed to protect her from harassment by other students. Defendants move for summary judgment on the ground that Defendants did not owe a constitutional duty to protect Plaintiff from harassment by private parties. The Supreme Court has held that "[a]s a general matter, . . . a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." DeShaney v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. 189, 197 (1989). There are, however, two exceptions to this general rule.

Under the first exception, the Supreme Court has recognized that when the State creates a "special relationship" with an individual by taking the individual into custody, the State assumes a constitutional duty of care. See DeShaney, 489 U.S. at 199-200 ("[W]hen the State takes a person into custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being."). "[T]his relationship, and thus constitutional duty, may exist when the individual is incarcerated or is involuntarily committed to the custody of the state." Rivera v. Rhode Island, 402 F.3d 27, 34 (1st Cir. 2005). Plaintiff does not rely on the so-called "special relationship" theory in this case and, in any event, the courts to decide the question have held that schools do not maintain the type of custodial relationship over their students envisioned by DeShaney. See, e.g., D.R. by L.R. v. Middle Bucks Area Vocational Tech. Sch., 972 F.2d 1364, 1371-72 (3d Cir. 1992) (en banc), cert. denied, 506 U.S. 1079 (1993); Doe v. Hillsboro Indep. Sch. Dist., 113 F.3d 1412, 1415 (5th Cir. 1997) (en banc); Doe v. Claiborne Cnty., 103 F.3d 495, 510 (6th Cir. 1996); J.O. v. Alton Cmty. Unit Sch. Dist. 11, 909 F.2d 267, 272 (7th Cir. 1990).

The second exception has been referred to as the "state-created danger" theory. In DeShaney, the Supreme Court reasoned that:

> While the State may have been aware of the dangers that [the child] faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them. [By returning the child to his abusive father, the State] placed him in no worse position than that in which he would have been had it not acted at all.

DeShaney, 489 U.S. at 201. From this reasoning, some courts have recognized that a constitutional duty to protect might arise when a "government employee, in the rare and exceptional case, affirmatively acts to increase the threat of harm to the claimant or affirmatively prevents the individual from receiving assistance." Frances-Colon v. Ramirez, 107 F.3d 62, 64 (1st Cir. 1997). Courts that have recognized this theory have required that the state actor engage in an affirmative act (rather than a failure to act) that creates or enhances danger to the individual. See Ramos-Pinero v. Puerto Rico, 453 F.3d 48, 55 n.9 (1st Cir. 2006) ("To the extent plaintiffs attempt to ground liability in the so-called 'state-created danger' theory, the absence of an affirmative act by the state in creating the danger is fatal to the claim."). Compare Rivera, 402 F.3d at 36-38 (no state-created danger where state actors failed to protect teenage murder witness from private violence despite assurances of protection and awareness of threats), with Dwares v. City of N.Y., 985 F.2d 94, 99 (2d Cir. 1993) (state-created danger where police encouraged skinheads to beat up flag-burning demonstrators), *overruled on other grounds by* Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit, 507 U.S. 163 (1993).

Here, Plaintiff has not provided evidence that Defendants engaged in any affirmative act (as opposed to a failure to act) that created or enhanced the danger posed to Plaintiff by the student harassers. Rather, the conduct at issue is Defendants' inaction, including failure to effectively investigate, intervene, and prevent harm to Plaintiff. See, e.g., Nabozny v. Podlesny, 92 F.3d 446, 460 (7th Cir. 1996) (no state-created danger where school turned a "deaf ear" to known harassment of student by another student); Graham v. Indep. Sch. Dist. No. I-89, 22 F.3d

991, 995 (10th Cir. 1994) (no state-created danger where school employees ignored warnings that a student had threatened violence against plaintiff's son on school grounds and son was subsequently shot); D.R. by L.R., 972 F.2d at 1373-76 (no state-created danger where school failed to investigate and prevent repeated sexual assault of student by another student).

In opposing summary judgment, Plaintiff points to evidence that after Assistant Principal Weinstein allegedly interviewed students in spring 2012 regarding the bullying, Weinstein discarded his notes upon his retirement instead of passing his notes on to his successor. Although Weinstein's act of discarding his notes may have hampered the school's investigation, there is no evidence that the school placed Plaintiff in a more dangerous position than had the school not acted at all—i.e. had the school not interviewed or investigated at all. See DeShaney, 489 U.S. at 201 (reasoning that by returning a child to his abusive father, the State "placed [the child] in no worse position than that in which he would have been had it not acted at all"). Although the school's investigation may have been ineffective, there is no evidence that the school's investigation increased or enhanced the danger to Plaintiff posed by the harassers. Plaintiff's § 1983 claim therefore fails on the ground that Plaintiff has not provided evidence that Defendants owed Plaintiff a constitutional duty to protect her from student harassment.

"Even if . . . the state plays a role in the creation or enhancement of danger, under a supposed state created danger theory, there is a further onerous requirement that the plaintiff must meet in order to prove a constitutional violation: the state actions must shock the conscience of the court." Rivera, 402 F.3d at 35; Hasenfus v. LaJeunesse, 175 F.3d 68, 72 (1st Cir. 1999) ("Outside of a few narrow categories, . . . this means conduct that is truly outrageous, uncivilized, and intolerable."). "The burden to show state conduct that 'shocks the conscience' is extremely high, requiring 'stunning evidence of arbitrariness and caprice' that extends beyond

'[m]ere violations of state law, even violations resulting from bad faith' to 'something more

egregious and extreme.'" Melendez-Garcia v. Sanchez, 629 F.3d 25, 36 (1st Cir. 2010) (quoting

J.R. v. Gloria, 593 F.3d 73, 80 (1st Cir. 2010)).

Here, Defendants' conduct does not approach the "extremely high" standard required for

behavior that shocks the conscience. The undisputed evidence shows that Defendants undertook

some measures to address Plaintiff's harassment. Defendants' response to the bullying and

threats may well have been unreasonable and ineffective in some respects. For instance,

Defendants could have made more efforts to communicate with faculty, take Plaintiff's

complaints and emotional distress seriously, and preserve documentation of their investigation.

Defendants' response, however, cannot be characterized as "so egregious, so outrageous, that it

may fairly be said to shock the contemporary conscience." Rivera, 402 F.3d at 36. Compare

Neal v. Fulton Cnty. Bd. of Educ., 229 F.3d 1069, 1076-77 (11th Cir. 2000) (holding that school

coach's conduct shocked the conscience where coach intentionally hit football player in the head

with a metal lock and knocked out his eye), and Rogers v. City of Little Rock, Ark., 152 F.3d

790, 796-97 (8th Cir. 1998) (finding substantive due process violation where officer raped

woman in connection with car stop), with Hasenfus, 175 F.3d at 72 (holding that school's failure

to take steps to prevent student's attempted suicide was "not even close to violating this

outrageousness standard"), and Abeyta v. Chama Valley Indep. Sch. Dist., 77 F.3d 1253, 1258

(10th Cir. 1996) (finding no substantive due process violation where teacher, *inter alia*, "turn[ed]

a deaf ear" to harassment of student by other students), and Smith v. Guilford Bd. of Educ., 226

F. App'x 58, 62 (2d Cir. 2007) ("Defendants' failure to respond to the harassing and bullying to

which Jeremy was subjected . . . while highly unfortunate, does not rise to the level of 'egregious

conduct . . so brutal and offensive to human dignity as to shock the conscience.'"). Plaintiff's §

1983 claim therefore fails on two independent grounds.

Finally, in opposing summary judgment on her § 1983 claim, Plaintiff contends that Assistant Principal Weinstein engaged in spoliation of evidence when he discarded his interview notes near the time of his retirement. Based on this alleged spoliation, Plaintiff asks the court to indulge an adverse inference for purposes of summary judgment that Weinstein discarded his notes "out of a sense that the document's contents hurt his position." Mem. Opp'n Mot. Summ. J. 31-32 [#54] (quoting Testa v. Wal-Mart Stores, Inc., 144 F.3d 173, 177 (1st Cir. 1998)).

"Where a proper evidentiary foundation has been laid, 'a trier of fact may (but need not) infer from a party's obliteration of a document relevant to a litigated issue that the contents of the document were unfavorable to that party.'" Booker v. Mass. Dep't of Pub. Health, 612 F.3d 34, 45 (1st Cir. 2010) (quoting Testa, 144 F.3d at 177). "This permissive negative inference springs from the commonsense notion that a party who destroys a document . . . when facing litigation, knowing the document's relevancy to issues in the case, may well do so out of a sense that the document's contents hurt his position." Testa, 144 F.3d at 177. "Before an adverse inference can arise, the sponsor of the inference must lay an evidentiary foundation, proffering evidence to show that the party who destroyed the document 'knew of (a) the claim (that is, the litigation or the potential for litigation), and (b) the document's potential relevance to that claim.'" Booker, 612 F.3d at 46 (quoting Testa, 144 F.3d at 177).

There is a genuine dispute as to whether Assistant Principal Weinstein destroyed notes regarding his investigation at a time when he knew of the potential for litigation. Weinstein testified that he "gave those few notes I had on the case to Peter [Badalament]," and "I took almost everything that was in my desk and dumped it in the recycling bin [b]ut nothing having to do with [Plaintiff] was destroyed." Weinstein Dep. 210-20 in Pl.'s Ex. C. However, in response

to an email from Principal Badalament requesting Weinstein to turn over his "files / notes from last spring (legal request)," Weinstein replied:

> Unfortunately, I deemed it best to destroy my disciplinary records, except what I reported on X2, which included suspensions, etc. Perhaps if it would help, maybe I could reconstruct some things with you and Scott [Camilleri]. My main interaction was the one in which Eva and [Plaintiff] attacked me verbally. Otherwise I was simply reportage [sic] of 2 keying incidents and 2 bathroom wall incidents, but I don't' have dates or further info on them. So, I can meet with you and Scott [Camilleri], but I can't provide written documentation.

Pl.'s Ex. H. Thus, for purposes of summary judgment the court will assume that Weinstein destroyed notes regarding his investigation in spring 2012, including notes regarding his alleged student interviews, at a time when he knew of the potential for litigation.

Even assuming that Weinstein engaged in spoliation, however, an adverse inference would not save Plaintiff's § 1983 claim. See Kronish v. United States, 150 F.3d 112, 128 (2d Cir. 1998) ("We do not suggest that the destruction of evidence, standing alone, is enough to allow a party who has produced no evidence—or utterly inadequate evidence—in support of a given claim to survive summary judgment on that claim."). "[A]t the margin, where the innocent party has produced some (not insubstantial) evidence in support of his claim, the intentional destruction of relevant evidence by the opposing party may push a claim that might not otherwise survive summary judgment over the line." Id.; Byrnie v. Town of Cromwell, 243 F.3d 93, 110 (2d Cir. 2001); see also Nation-Wide Check Corp. v. Forest Hill Distrib., 692 F.2d 214, 218-19 (1st Cir. 1982) ("The issue before the court was not whether the destruction was sufficient, standing alone, to warrant an adverse inference about the documents' contents; it was simply whether the destruction was at all relevant to the tracing issue, and if so, whether it was sufficiently probative *in conjunction with other evidence* to support the tracing conclusion." (emphasis added)).

Plaintiff's § 1983 claim is not "close" or "at the margin." See Kronish, 150 F.3d at 128; Byrnie, 243 F.3d at 110. Rather, Plaintiff has presented no evidence as to an essential element of her legal claim—that is, that the school owed Plaintiff a constitutional duty to protect her from student harassers under either the "special relationship" or "state-created danger" exceptions to DeShaney. As to the former exception, Plaintiff has not asserted the special relationship theory in this case and, in any event, the courts to decide the question have rejected the special relationship theory in the school context. As to the latter exception, Plaintiff has not presented evidence of an affirmative act by the school that created or enhanced danger to Plaintiff such that the school placed Plaintiff in a more dangerous position than had the school not acted at all. The most a jury reasonably could infer from Weinstein's act of discarding his interview notes is that Weinstein's interviews were cursory, that perhaps the interviews revealed unpursued leads, or even that the interviews did not take place. Plaintiff has not presented evidence (circumstantial or otherwise) that Weinstein's notes would contain evidence of some unidentified affirmative act by the school that created or enhanced the danger posed to Plaintiff by the student bullies. Without any evidence of such an affirmative act, the jury would have to infer an essential element of Plaintiff's § 1983 claim based solely on speculation as the content of Weinstein's notes. See, e.g, Chappell-Johnson v. Bair, 574 F. Supp. 2d 87, 102 (D.D.C. 2008) ("[N]o reasonable jury could award damages against [plaintiff's] employer based *solely* on *speculation* as to what *might* be contained in documents *not in evidence*. Simply put, without any *evidence*, a generalized adverse inference, *alone*, will not support a jury verdict." (emphasis in original)). Accordingly, summary judgment is granted on Count II.[7]

---

[7] Moreover, the Individual Defendants in their individual capacities are entitled to qualified immunity on the ground that it was not clearly established that Defendants created a danger in this case sufficient to give rise to a duty to protect under DeShaney or that Defendants' behavior

C.       *Exercise of Supplemental Jurisdiction*

Defendants ask the court to decline to exercise supplemental jurisdiction over the remaining state-law claims.  Under 28 U.S.C. § 1367(c), "[t]he district court may decline to exercise supplemental jurisdiction over a claim" if "the district court has dismissed all claims over which it has original jurisdiction."  "Whether a court should decline supplemental jurisdiction depends on a 'pragmatic and case-specific evaluation of a variety of considerations,' including 'the interests of fairness, judicial economy, convenience, and comity.'"  Desjardins v. Willard, 777 F.3d 43, 45 (1st Cir. 2015) (quoting Camelio v. Am. Fed'n, 137 F.3d 666, 672 (1st Cir. 1998)).  "As a general principle, the unfavorable disposition of a plaintiff's federal claims at the early stages of a suit . . . will trigger the dismissal without prejudice of any supplemental state-law claims."  Rodriguez v. Doral Mortg. Corp., 57 F.3d 1168, 1177 (1st Cir. 1995).

In considering the totality of the circumstances, the court concludes that the interests of fairness, judicial economy, and convenience weigh in favor of resolving the state-law claims.  The parties have been litigating this case for over two years, and the discovery period closed months before Defendants filed for summary judgment.  Moreover, the state-law questions raised in Plaintiff's claims are not so novel or complex "as to warrant the added time and expense inherent in [re-filing in] state court."  See Senra v. Town of Smithfield, 715 F.3d 34, 41 (1st Cir. 2013); see also Tomaiolo v. Mallinoff, 281 F.3d 1, 11 (1st Cir. 2002) (finding that exercise of supplemental jurisdiction "furthered judicial economy" where "all claims arose from the same core of facts").  The court will therefore exercise supplemental jurisdiction.

---

shocks the conscience.  See, e.g., Melendez-Garcia, 629 F.3d at 37 (affirming qualified immunity on failure-to-protect theory of substantive due process).

D.      *Count III: Intentional Infliction of Emotional Distress*

In Count III, Plaintiff brings a claim for intentional infliction of emotional distress against the Individual Defendants in their official and individual capacities. A suit against public officials in their official capacities is a suit against the government entity itself. Surprenant v. Rivas, 424 F.3d 5, 19 (1st Cir. 2005). The Individual Defendants in their official capacities move for summary judgment on the ground that public entities are immune from liability for intentional torts under the Massachusetts Tort Claims Act ("MTCA").

The MTCA provides a limited waiver of sovereign immunity for certain tort claims against public entities. See Spring v. Geriatric Auth. of Holyoke, 475 N.E.2d 727, 734 (Mass. 1985). Under the MTCA, however, public entities remain immune from "any claim arising out of an intentional tort . . . ." Mass. Gen. Laws ch. 258, § 10(c). Accordingly, the court will allow summary judgment on Count III for the Individual Defendants in their official capacities.

The Individual Defendants in their individual capacities move for summary judgment on Count III on the ground that Plaintiff has not presented evidence that they engaged in "extreme and outrageous" conduct. To prevail on a claim for intentional infliction of emotional distress, a plaintiff must establish that the defendants' conduct was "extreme and outrageous." Tetrault v. Mahoney, Hawkes & Goldings, 681 N.E.2d 1189, 1197 (Mass. 1997). Extreme and outrageous conduct is behavior that is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Foley v. Polaroid Corp., 508 N.E.2d 72, 82 (Mass. 1987) (internal quotation marks and citation omitted). "[L]iability cannot be predicated upon 'mere insults, indignities, [or] threats . . . ,' nor even is it enough 'that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even

that his conduct has been characterized by 'malice' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort.'" Id. (quoting Restatement (Second) of Torts § 46, cmt. d (1965)). "The standard for making a claim of intentional infliction of emotional distress is very high." Doyle v. Hasbro, Inc., 103 F.3d 186, 195 (1st Cir. 1996).[8]

"Even putting as harsh a face on [Defendants'] actions" as the facts reasonably allow, Tetrault, 681 N.E.2d at 1197, Defendants' response was not, as a matter of law, so extreme and outrageous as to constitute intentional infliction of emotional distress. As stated above, Defendants made some efforts to respond to Plaintiff's harassment. Defendants, for instance, met with Plaintiff and her parents, offered Plaintiff an alternative parking lot, contacted and coordinated with police, assigned monitors to the parking lot, assigned monitors to shadow Plaintiff in school, implemented a plan for Plaintiff's friend to accompany her to the restroom while in the Rivers and Revolutions Program, installed cameras, collected and visually compared writing samples, asked teachers to read messages in first block classes to elicit tips, and sent "Connect-Ed" messages to the school community regarding at least some incidents which included an email address for anonymous reporting of tips. Additionally, Principal Badalament, as well as Detective Camilleri, spoke with at least some students who were the subject of tips.

As stated above, a jury could find that Defendants' response to the incidents was at times ineffective and unreasonable. Of particular concern is the fact that the most pronounced portion of Assistant Principal's Weinstein's recollection of the incident in which "cunt" was keyed on

---

[8] "It is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery . . . ." Caputo v. Bos. Edison, Co., 924 F.2d 11, 14 (1st Cir. 1991) (applying Massachusetts law) (quoting Restatement (Second) Torts § 46 cmt. h (1965)); see, e.g., Roman v. Trs. of Tufts Coll., 964 N.E.2d 331, 342 (Mass. 2012) (affirming summary judgment on claim for intentional infliction of emotional distress on the ground that defendant's conduct did "not approach the type of behavior that could be considered 'extreme and outrageous'").

Plaintiff's car is that Plaintiff yelled at him.  See Weinstein Dep. 145 in Pl.'s Ex C; Pl.'s Ex. H at

p.10.  However, even if a jury could find that Assistant Principal Weinstein's actions were

unreasonable and demonstrate indifference, no reasonable jury could find that Defendants'

response went beyond all possible bounds of decency and was utterly intolerable in a civilized

community.  See, e.g., Jones v. Maloney, 910 N.E.2d 412, 417 (Mass. App. Ct. 2009) (holding

that assistant principal's allegedly defective investigation did not rise to the level of extreme and

outrageous conduct); Morgan v. Town of Lexington, No. 14-13781-DJC, 2015 WL 5634463, at

*7-8 (D. Mass. Sept. 24, 2015) (citing cases); Doe v. Bradshaw, No. 11-11593, 2013 WL

5236110, at *13 (D. Mass. Sept. 16, 2013) (holding school officials' investigation of high school

coach's sexual misconduct with students, while "on the border of 'deliberate indifference' or

'intentional discrimination,'" was insufficiently extreme and outrageous); Doe v. Town of

Bourne, No. 02-11363, 2004 WL 1212075, at *13 (D. Mass. May 8, 2004) (holding that school's

failure to inform plaintiff's parents or the police, or to conduct its own investigation, in response

to learning that plaintiff had been raped at school was insufficiently extreme and outrageous).

Summary judgment is therefore granted on Count III.

###### E.       Count IV: Negligent Infliction of Emotional Distress

In Count IV, Plaintiff brings a claim for negligent infliction of emotional distress against

the Individual Defendants in their official and individual capacities.  The Individual Defendants

in their official capacities move for summary judgment on the ground that Plaintiff failed to

make proper presentment of her claim prior to filing suit as required by the MTCA.

The MTCA provides that "[a] civil action shall not be instituted against a public

employer on a claim for damages under this chapter unless the claimant shall have first presented

his claim in writing to the executive officer of such public employer within two years after the

date upon which the cause of action arose . . . ." Mass. Gen. Laws ch. 258, § 4. Under this provision, "the plaintiff must make the required presentment prior to the commencement of suit." Haley v. City of Bos., 657 F.3d 39, 54 (1st Cir. 2011). A presentment letter must "identify[ ] the legal basis of a plaintiff's claim." Rodriguez v. City of Somerville, 33 N.E.3d 1240, 1244 (Mass. 2015) (internal quotation marks and citation omitted). "If proper presentment is not made within the time allotted, the plaintiff's complaint is subject to dismissal." Spring v. Geriatric Auth. of Holyoke, 475 N.E.2d 727, 733 (Mass. 1985). Plaintiff has not provided evidence that she made proper presentment before filing suit. Accordingly, Count IV against the Individual Defendants in their official capacities is subject to dismissal.

Even if Plaintiff had complied with the presentment requirements, the Individual Defendants in their official capacities are immune from liability on Count IV. Under the MTCA, a public employer is immune from "any claim based on an act or failure to act to prevent or diminish the harmful consequences of a condition or situation, including the violent or tortious conduct of a third person, which is not originally caused by the public employer or any other person acting on behalf of the public employer." Mass. Gen. Laws ch. 258, § 10(j). For a public employer's conduct to constitute an "original cause" the public employer must have engaged in an "affirmative act (not a failure to act)" that "materially contributed to creating the specific 'condition or situation' that resulted in the harm." Kent v. Commonwealth, 771 N.E.2d 770, 775-76 (Mass. 2002); see also Brum v. Town of Dartmouth, 704 N.E.2d 1147, 1155 (Mass. 1999) ("[T]he principal purpose of § 10(j) is to preclude liability for failure to prevent or diminish harm, including harm brought about by the wrongful act of a third party.").

Here, Plaintiff has not presented evidence of an affirmative act (as opposed to a failure to act) by the Individual Defendants that originally caused Plaintiff to suffer harassment. See, e.g.,

Doe v. Old Rochester Reg'l Sch. Dist., 56 F. Supp. 2d 114, 121 (D. Mass. 1999) ("Even if the School District ignored the Does' complaints about harassment by other students, there are no allegations that it 'originally caused' the students to harass Jane Doe."); Brum, 704 N.E.2d at 1155-56 (holding that school officials were immune from suit claiming they failed to protect student from an in-school stabbing). Thus, even if Plaintiff had made presentment, summary judgment is proper on Count IV for the Individual Defendants in their official capacities.

Additionally, the Individual Defendants in their individual capacities move for summary judgment on Count IV on the ground that Plaintiff's negligence claim is barred by the MTCA. The MTCA shields public employees from personal liability for negligent conduct occurring within the scope of their employment. See Mass. Gen. Laws ch. 258, § 2 ("[N]o such public employee . . . shall be liable for any injury . . . caused by his negligent or wrongful act or omission while acting within the scope of his office or employment."); Caisse v. DuBois, 346 F.3d 213, 218 (1st Cir. 2003). Because the Individual Defendants' allegedly negligent conduct occurred within the scope of their employment, Plaintiff's claim against the Individual Defendants in their individual capacities is barred and summary judgment is granted.

F.    *Count V: Massachusetts Civil Rights Act*

In Count V, Plaintiff brings a claim against all defendants under the Massachusetts Civil Rights Act ("MCRA"). The Town, School District, and Individual Defendants in their official capacities move for summary judgment on the ground that municipal entities are not subject to liability under the MCRA. "[A] municipality is not a 'person' covered by the [MCRA]." Howcroft v. City of Peabody, 747 N.E.2d 729, 744 (Mass. App. Ct. 2001); see also Kelley v. LaForce, 288 F.3d 1, 11 n.9 (1st Cir. 2002). Accordingly, summary judgment is granted for the Town, School District, and Individual Defendants in their official capacities on Count V.

The Individual Defendants in their individual capacities also move for summary judgment on the ground that there is no evidence that they interfered with Plaintiff's rights "by threats, intimidation or coercion." The MCRA prohibits persons from interfering with federal and state rights "by threats, intimidation or coercion." Mass. Gen. Laws ch. 12 § 11H. "The Massachusetts legislature intended that even a direct deprivation of a plaintiff's rights would not be actionable under the act unless it were accomplished by means of one of these three constraining elements." Nolan v. CN8, 656 F.3d 71, 77 (1st Cir. 2011) (internal quotation marks and citation omitted). "'Threat' in this context involves the intentional exertion of pressure to make another fearful or apprehensive of injury or harm." Planned Parenthood League of Mass., Inc. v. Blake, 631 N.E.2d 985, 990 (Mass. 1994). "'Intimidation' involves putting in fear for purposes of compelling or deterring conduct." Id. "Coercion" involves "the application to another of such force, either physical or moral, as to constrain him to do against his will something he would not otherwise have done." Id.

Plaintiff has not provided evidence from which a jury could find that Defendants violated Plaintiff's federal or state rights. See Dean v. City of Worcester, 924 F.2d 364, 370 (1st Cir. 1991) (affirming summary judgment on MCRA claim where plaintiff failed to establish violation of a federal or state right). Nor has Plaintiff provided evidence that Defendants interfered with any such right "by threats, intimidation or coercion." Although there is evidence that the harassers used threats, intimidation, or coercion, there is no evidence that the Defendants did so. Summary judgment is therefore granted on Count V.

G.      *Count VI: Massachusetts Declaration of Rights*

In Count VI, Plaintiff alleges that Defendants violated her right to substantive due process under Article 10 of the Massachusetts Declaration of Rights. Plaintiff has not argued or

otherwise demonstrated that the Massachusetts Declaration of Rights provides greater

substantive due process protections than the United States Constitution in this context.  See, e.g.,

Christensen v. Kingston Sch. Comm., 360 F. Supp. 2d 212, 215 n.1 (D. Mass. 2005) (treating

federal and state substantive due process claims identically where plaintiff had not argued "that

the Massachusetts Declaration of Rights provides greater substantive due process protections in

this context").  Therefore, for the reasons articulated above in relation to Plaintiff's federal due

process claim, the court grants summary judgment for Defendants on Count VI.

IV.    Conclusion

　　　　For the above-stated reasons, Defendants' Motion for Summary Judgment [#34] is

ALLOWED.

　　　　IT IS SO ORDERED.

　　　　September 30, 2015                                    /s/ Indira Talwani
                                                            United States District Judge